[No. D057777. Fourth Dist., Div. One. Sept. 16, 2011.]

NEIL S., Plaintiff and Appellant, v.
MARY L. et al., Defendants and Respondents.

COUNSEL

Yelman & Associates, Charles Wesley Kim; and Sharron Voorhees for Plaintiff and Appellant.

Stephen Temko for Defendant and Respondent Mary L.

Galichon & MacInnes and Scott Richard MacInnes for Defendant and Respondent Scott J.

OPINION

**O'ROURKE, J.**—Appellant Neil S. appeals from an order granting respondents Mary L. and Scott J.'s motion[1] to quash Neil's petition to establish paternity, obtain joint custody and reasonable visitation, pay child support, and for genetic testing. In that petition, Neil sought to establish a parent-child relationship with twins born to Mary while she was married to Scott, who had accepted the children as his own. Asserting his relationship with the children began *in utero* while he attended to Mary's neonatal care and sang or talked to the unborn children, and that Mary and Scott obstructed his ability to take them into his home, Neil contends he has a constitutionally protected due process right to an opportunity to develop or continue his relationship with them. He asks this court to hold Family Code section 7611, subdivision (d)[2] of the Uniform Parentage Act (§ 7600 et seq.; the UPA) and its "related statutory scheme" unconstitutional both facially and as applied to these facts on due process and equal protection grounds. He also challenges the constitutionality of section 7612, subdivision (b), requiring a court to reconcile conflicting paternity presumptions, when applied to presumed unwed fathers.

We conclude the family court correctly dismissed Neil's petition for lack of standing, and that, on these facts, *Dawn D. v. Superior Court* (1998) 17 Cal.4th 932 [72 Cal.Rptr.2d 871, 952 P.2d 1139] (*Dawn D.*) defeats his claim to a due process "opportunity" interest in establishing a parent-child relationship with the children. We reject Neil's remaining contentions. Accordingly, we affirm the order.

### FACTUAL AND PROCEDURAL BACKGROUND

In May 2009 Mary, who has been married to her husband Scott since June 2001, gave birth to twins. Scott was present at the birth and has accepted the twins as his children.

---

[1] Mary's husband Scott joined the motion to quash after it was filed. The family court ordered his joinder in May 2010 pursuant to the parties' stipulation. We shall refer to Mary and Scott collectively as respondent.

[2] All statutory references are to the Family Code unless otherwise indicated.

In February 2010, when the twins were 10 months old, Neil filed a petition to establish paternity and for an order awarding him joint custody and reasonable visitation, as well as genetic testing to determine his status as the children's biological father. In his supporting declaration, he stated that from May 2008 to October 2008, he and Mary, both career sailors, had an affair while they were stationed in Bahrain. He asserted they spoke of marriage and had agreed to marry each other. Neil was also married at the time. According to Neil, Mary left for San Diego in October 2008 and upon her return to Bahrain, tests indicated she was pregnant with twins. He claimed she told him she had conceived in the middle to early part of September, and the children were his.

Neil declared that from October 2008 until Mary left Bahrain in February 2009, he took her to doctor visits and generally cared for her, and spoke, read and sang to the twins *in utero*. According to Neil, after Mary returned to San Diego in February 2009, she notified him that she and Scott would be raising the children, and her husband's name would be placed on their birth certificates.

Mary moved to quash the petition. She argued Neil lacked standing to pursue an action to determine the existence of a parent-child relationship under section 7630, and would never prevail in his attempt to be deemed the twins' presumed father; that her husband was conclusively and rebuttably presumed to be the children's father. In her supporting declaration, Mary disputed many of Neil's assertions concerning the nature and extent of their relationship. She asserted that between October 8, 2008, and October 22, 2008, she and her husband resided together at their home and engaged in sexual relations on a regular basis, and thereafter, in November 2008, she discovered she was pregnant. Mary stated Scott was involved in preparing for the twins' arrival and birth, was present at their birth, chose their names with her, attended parenting classes with her, and visited the twins every day during the month they were in neonatal intensive care as a result of their premature birth, helping with their care including feeding and swaddling. Scott's name was placed on the children's birth certificates. According to Mary, Scott was a "stay-at-home" dad and the twins' primary caregiver at the time and did their feeding, changed diapers, bathed and dressed them, took them to doctors' appointments, played and read to them, and was otherwise responsible for meeting their needs since birth.

Neil opposed the motion to quash, in part arguing the marital presumption of paternity did not apply and the state had a compelling interest in establishing the paternity of children for purposes of their access to benefits, knowledge of family medical history and their emotional development. He argued public policy was best served by determining the children's true paternity. Neil challenged Mary's truthfulness and, in an accompanying

declaration, set out additional details of their relationship and circumstances surrounding the date of conception, his involvement in the children's prenatal care, his attempts to work out a child sharing arrangement, his conduct in holding the children out as his own to his family members, and his efforts to file a voluntary declaration of paternity. He asserted Mary had admitted he was the children's father and initially promised he would be involved with them, but later ended her contact, even returning Christmas gifts he had sent them. He emphasized there were two intact families available to raise the children. Neil's wife and parents submitted declarations expressing their desire to help raise the children.

Mary moved to strike most of Neil's declaration and much of his responsive submission.[3]

The court granted Mary's motion: quashing Neil's petition and ordering the action dismissed. It ruled Neil had presented evidence that he held the children out as his own, but found it undisputed that he did not receive them into his home. The court found while his evidence showed he made "reasonable, if not extraordinary" attempts to receive the children into his home but was prevented by Mary from doing so, such a theory of "constructive receipt" had been rejected by *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 [4 Cal.Rptr.2d 615, 823 P.2d 1216]. Thus, it ruled Neil could not establish presumed father status under section 7611, subdivision (d). Finding the issue addressed by *Dawn D., supra*, 17 Cal.4th 932, the court disposed of Neil's argument that he was deprived of a constitutionally cognizable "opportunity" interest in developing a relationship with the children.

This appeal followed from the ensuing order dismissing the case.

## DISCUSSION

### I. *Presumptions of Paternity*

■ The UPA with its various presumptions provides the framework by which California courts make paternity determinations. (*Dawn D., supra*, 17 Cal.4th at p. 937; *Said v. Jegan* (2007) 146 Cal.App.4th 1375, 1381 [53

---

[3] At the same time Mary filed her motion to strike, Neil submitted a "separate statement of facts" as well as a declaration from an expert medical doctor and professor who, based on ultrasounds, gave an opinion concerning the start of the children's gestational period and date of conception. Mary objected to this declaration on grounds it was irrelevant and lacked foundation or personal knowledge. She objected to the separate statement and other pleadings filed by Neil on grounds they were irrelevant, untimely, and lacked foundation and personal knowledge. The court implicitly overruled Mary's objections to the expert declaration, finding based on the evidence there was merit to Neil's allegation he was the children's biological father.

Cal.Rptr.3d 661].) Under section 7540, "the child of a wife cohabitating with her husband, who is not impotent or sterile, is conclusively presumed to be a child of the marriage." The statute establishes what has been described as a "conclusive" presumption of paternity in a case of a child born to a wife cohabitating with her husband at the time of conception. (*Dawn D.*, 17 Cal.4th at p. 937, fn. 4.) This presumption is subject to challenges not applicable here. (*Ibid.*; §§ 7540, 7541, subds. (b), (c).)

■ Section 7611 describes presumptions of paternity that may be rebutted "in an appropriate action" by clear and convincing evidence. (§§ 7611, 7612, subd. (a).) Under subdivision (a) of section 7611, "a man is presumed [to be] the natural father of a child born during, or within 300 days after the termination of, his marriage to the child's mother." (*Dawn D., supra*, 17 Cal.4th at p. 937.) This presumption does not require any proof of cohabitation; rather, the only predicate is birth during a valid marriage or within 300 days after the marriage's termination. (*Craig L. v. Sandy S.* (2004) 125 Cal.App.4th 36, 48 [22 Cal.Rptr.3d 606] (*Craig L.*).) The section 7611, subdivision (a) presumption may be challenged only by the child, the mother or a presumed father. (§ 7630, subd. (a);[4] *Dawn D.*, 17 Cal.4th at pp. 937–938; *Craig L.*, 125 Cal.App.4th at p. 48.)

■ Section 7611, subdivision (d) creates a rebuttable presumption that a man is the natural father of a child if he "receives the child into his home and openly holds out the child as his natural child." Establishing presumed father status under this presumption requires a certain level of contact between the alleged father and child; a putative father's time spent with the child on alternate weekends has been held sufficient to constitute receiving a child into his home (*Craig L., supra*, 125 Cal.App.4th at p. 45, citing *In re Richard M.* (1975) 14 Cal.3d 783, 790–796 [122 Cal.Rptr. 531, 537 P.2d 363]), as has daytime childcare and one overnight stay each week in the putative father's home. (*Craig L.*, at pp. 44, 45–46.) Any "interested party" may bring an action to determine the existence of a parent-child relationship under this subdivision. (§ 7630, subd. (b).)[5]

---

[4] Section 7630, subdivision (a) states: "A child, the child's natural mother, [or] a man presumed to be the child's father under subdivision (a), (b), or (c) of Section 7611, . . . may bring an action as follows: [¶] (1) At any time for the purpose of declaring the existence of the father and child relationship presumed under subdivision (a), (b), or (c) of Section 7611. [¶] (2) For the purpose of declaring the nonexistence of the father and child relationship presumed under subdivision (a), (b), or (c) of Section 7611 only if the action is brought within a reasonable time after obtaining knowledge of relevant facts. After the presumption has been rebutted, paternity of the child by another man may be determined in the same action, if he has been made a party."

[5] Section 7630, subdivision (b) provides: "Any interested party may bring an action at any time for the purpose of determining the existence or nonexistence of the father and child relationship presumed under subdivision (d) or (f) of Section 7611." Section 7630,

■ "Although more than one individual may fulfill the statutory criteria that give rise to a presumption of paternity, 'there can be only one presumed father.' " (*In re Jesusa V.* (2004) 32 Cal.4th 588, 603 [10 Cal.Rptr.3d 205, 85 P.3d 2].) When two or more conflicting presumptions arise under section 7611—as when more than one man qualifies as a presumed father under them—a court must reconcile these competing interests under section 7612, and under that section " 'the presumption which on the facts is founded on the weightier considerations of policy and logic controls.' " (*In re Jesusa V.*, at p. 603, quoting § 7612, subd. (b).)

■ Further, section 7612 "[does] not envision an *automatic* preference for biological fathers, even if the biological father has come forward to assert his rights." (*In re Jesusa V., supra*, 32 Cal.4th at p. 604 [interpreting § 7612, subd. (a)].) "Indeed . . . 'if the Legislature had intended that a man who is not a biological father cannot be a presumed father under section 7611, it would not have provided for such weighing, for among two *competing* claims for presumed father status under section 7611, there can be only one biological father.' " (*Jesusa V.*, at p. 604.) Thus, a court is not bound by section 7612 to accord determinative weight to biology. (*Jesusa V.*, at p. 607; *H.S. v. Superior Court* (2010) 183 Cal.App.4th 1502, 1508 [108 Cal.Rptr.3d 723].)

Rather, the core considerations are the integrity of the family and protection of the child's well-being, which require us to assess the existence and nature of the social relationship between a putative father and child. "The paternity presumptions are generated by society's interest in preserving the integrity of the family and legitimate concerns for the welfare of the child. The state has an ' " 'interest in preserving and protecting the developed parent-child . . . relationships which give young children social and emotional strength and stability.' " ' " (*Lisa I. v. Superior Court* (2005) 133 Cal.App.4th 605, 613 [34 Cal.Rptr.3d 927], quoting *In re Nicholas H.* (2002) 28 Cal.4th 56, 65 [120 Cal.Rptr.2d 146, 46 P.3d 932].) This court in particular recognizes that "the constitutionally valid objective of our paternity laws is 'the protection of the child's well being.' " (*Craig L., supra*, 125 Cal.App.4th at p. 51, quoting *Adoption of Kelsey S., supra*, 1 Cal.4th at p. 845.) "[I]ncreasingly over the last three decades, our courts have resolved paternity disputes by looking to the existence and nature of the social relationship between the putative father and child." (*Craig L.*, at p. 51.) We have given "great weight" to these social relationships, holding the relationship of a man who has lived with a child and treated the child as his son or daughter " ' " 'is much more important, to the child at least, than a biological relationship of actual

---

subdivision (c) allows for actions to determine the existence of the father and child relationship for children without a presumed father. Subdivision (c) does not apply here, where, as we explain below, Scott is a presumed father under subdivisions (a) and (d) of section 7611.

paternity.' " ' " (*Ibid.*, quoting *In re Marriage of Freeman* (1996) 45 Cal.App.4th 1437, 1445 [53 Cal.Rptr.2d 439].)

## II. *Standing*

■ In quashing Neil's petition and dismissing the action, the family court did not make an express determination of the threshold issue of standing. That is of no moment, as standing is a question of law, particularly where, as here, it depends on statutory provisions conferring standing. (*T.P. v. T.W.* (2011) 191 Cal.App.4th 1428, 1432–1433 [120 Cal.Rptr.3d 477].)

■ Though Neil argued below that he had standing to bring a paternity challenge under section 7611, subdivision (d), on appeal, he does not squarely argue he possesses standing under this provision or the UPA to determine the existence of a parent-child relationship with the children. We conclude he does not. Scott—who is married to Mary and has not only held out the children as his own but also has taken them into his home—attains presumed father status under both subdivisions (a) and (d) of section 7611. (Accord, *Dawn D., supra*, 17 Cal.4th at p. 937; *Lisa I. v. Superior Court, supra*, 133 Cal.App.4th at pp. 613–614.) By contrast, Neil, who never married or attempted to marry Mary, and never received the children into his home despite considerable efforts to do so, cannot attain presumed status under section 7611. Thus, even assuming Neil qualified as an "interested party" under section 7630, subdivision (b) (see *ante*, fn. 5), his action "would appear neither to affect [Scott's] status as a presumed father under subdivision (a) of section 7611 nor to confer on [Neil] presumed father status." (*Dawn D.*, at p. 938, fn. 5.) Under these circumstances, the UPA precludes Neil from bringing a paternity action and from compelling Mary and the children to submit to blood tests to resolve the question of biological parenthood. (*Dawn D.*, at p. 938; *Lisa I.*, at pp. 613–614.)

## III. *Constitutional Challenges*

Neil's focus on appeal is his claim that the UPA is unconstitutional to the extent it denies him—an alleged father[6]—the opportunity to establish or develop a parent-child relationship. Neil argues he has a constitutionally protected liberty interest in that opportunity as a matter of substantive due process under the state and federal Constitutions. He characterizes this case as one of first impression, claiming no other case presents the scenario where

---

[6] A man who may be the father of a child, but whose biological paternity has not been established or alternatively has not achieved presumed father status, is an alleged father. (*In re Zacharia D.* (1993) 6 Cal.4th 435, 449, fn. 15 [24 Cal.Rptr.2d 751, 862 P.2d 751]; *In re Jason J.* (2009) 175 Cal.App.4th 922, 932, fn. 4 [96 Cal.Rptr.3d 625].)

a man with his own extant marital family unit had a "prenatal relationship with [the children]" but was "obstructed" by the mother and her husband from taking them into his own home after their birth so as to prevent him from become a presumed father. Pointing out DNA analysis can now determine paternity with virtual certainty, Neil asserts that "a biological connection alone ought to be enough" on which to base his right to assert or prove he has parental rights.

Neil additionally contends his interest is protected by state and federal constitutional equal protection; that unwed biological fathers should be entitled to the same rights and obligations as "formerly-married-now-divorced" biological fathers. Based on these arguments, he asks us to hold section 7611, subdivision (d) unconstitutional both on its face and as applied to his circumstances on due process and equal protection grounds. He suggests we should also hold section 7612, subdivision (b) unconstitutional on equal protection grounds as applied to him because, even if he were given presumed father status, the court could still find Scott's presumption controls under "weightier considerations of policy and logic."

Mary points out that Neil did not raise his equal protection arguments or the constitutionality of section 7612, subdivision (b) in the trial court. She responds that later authorities—*In re Nicholas H., supra*, 28 Cal.4th 56 and *In re Jesusa V., supra*, 32 Cal.4th 588—hold biological paternity does not automatically rebut the section 7611 marital and nonmarital presumptions where two putative parents both have standing. She maintains Neil was not deprived of a liberty interest because he does not have an existing relationship with the children.

A. Dawn D. *Defeats Neil's Claim of a Constitutional Due Process Liberty Interest*

We conclude Neil's constitutional due process challenge is squarely resolved by the California Supreme Court's decision in *Dawn D., supra*, 17 Cal.4th 932. In *Dawn D.*, the mother became pregnant while separated from her husband and living with another man. (*Dawn D.*, at p. 936.) After she became pregnant, the mother assertedly told others the baby was the alleged father's and that they intended to marry, but several months later, she reconciled with her husband. (*Id.* at pp. 936, 949 (dis. opn. of Chin, J.).) Thereafter, the alleged biological father filed a complaint to establish a parental relationship with the then unborn child, and completed a parenting course. (*Ibid.*) A few months later, the mother gave birth to the child, and the child had resided with her and her husband since his birth. (*Ibid.*) The alleged father attempted to, but could not, negotiate an agreement for child support and visitation with the mother and her husband. (*Ibid.*)

■ The court first pointed out that under the UPA, the mother's husband was, rebuttably, a presumed father under section 7611, subdivisions (a) and (d), and the alleged biological father met none of the statutory conditions for presumed father status. (*Dawn D., supra,* 17 Cal.4th at p. 937.) It held the alleged biological father (as Neil here) could not rebut the husband's presumed father status because he lacked standing to bring the paternity action which precluded him from compelling the mother and child to submit to blood tests to resolve the question of biological parenthood. Under the circumstances, section 7630, subdivision (a) restricted standing to challenge the presumption of a husband's paternity to the child, the child's natural mother, or a presumed father. (*Dawn D.,* at pp. 937–938.)

The court then turned to the question of whether the alleged biological father had a "liberty interest, protected as a matter of substantive due process, in being permitted to develop a parental relationship with his offspring." (*Dawn D., supra,* 17 Cal.4th at p. 938.) In order to reach that question, the court emphasized it was required to first make a " ' "careful description" ' " (*id.* at pp. 940, 941, quoting *Washington v. Glucksberg* (1997) 521 U.S. 702, 721 [138 L.Ed.2d 772, 117 S.Ct. 2258, 117 S.Ct. 2302]) of the asserted fundamental liberty interest. Under the circumstances there, the alleged father sought constitutional protection for "his interest in establishing a relationship with his child born to a woman married to another man at the time of the child's conception and birth." (*Dawn D.,* at p. 941.) Only if that were determined to be a fundamental interest would the court then weigh the state's countervailing interest to determine whether the latter was sufficiently compelling to justify the state's infringement of the liberty interest. (*Id.* at pp. 940–941.)

■ As for whether the alleged father's interest was constitutionally protected under those circumstances, the *Dawn D.* court found a "ready answer" to that question in *Michael H. v. Gerald D.* (1989) 491 U.S. 110 [105 L.Ed.2d 91, 109 S.Ct. 2333], in which a plurality of justices "concluded the biological father of a child born to a woman married to another man had no liberty interest in continuing his relationship with the child, notwithstanding that he had lived with the mother and child for almost a year and visited her for an additional eight months, and the child called him 'Daddy.' " (*Dawn D., supra,* 17 Cal.4th at p. 941.) The *Dawn D.* court observed that in rejecting that liberty interest claim, the *Michael H.* plurality "necessarily rejected as well the position that a biological connection without any actual personal relationship gives rise to a protected liberty interest." (*Dawn D.,* at p. 941.) The California Supreme Court further pointed out that though three dissenting justices in *Michael H.* disagreed with that conclusion, those justices nevertheless "rejected . . . the possibility that a biological father having no *existing* personal relationship with his child born to a woman married to another man could have any liberty interest in establishing a

relationship with the child" (*Dawn D.*, at p. 941) and thus "at least seven of the nine high court justices in *Michael H.* expressly rejected the view that an unwed father's biological link to a child alone gives rise to a protected liberty interest." (*Dawn D.*, at p. 942.)[7]

Because the alleged father in *Dawn D.* had never had any "personal relationship" with the mother's child, but "only an alleged biological link with an attempt to negotiate an agreement for child support and visitation," he could not establish a constitutionally protected due process liberty interest. (*Dawn D., supra*, 17 Cal.4th at p. 942.)

Neil seeks to distinguish *Dawn D.* on grounds that, unlike the biological father in *Dawn D.*, he has presented facts demonstrating a "relationship with his twins commencing at the very first notice of [Mary's] pregnancy and continuing unabated until the mother moved away and refused to let [him] visit the children." Neil's apparent theory is that an important parental relationship with a child may begin while the child is *in utero*. Our society's interest, however, is in preserving and protecting the " ' "*developed* parent-child . . . relationships" ' " (*In re Nicholas H., supra*, 28 Cal.4th at p. 65, italics added) because it is those actual, developed relationships " ' "which give young children social and emotional strength and stability." ' " (*Ibid.*; see also *Lisa I. v. Superior Court, supra*, 133 Cal.App.4th at p. 613; *Susan H. v. Jack S.* (1994) 30 Cal.App.4th 1435, 1442 [37 Cal.Rptr.2d 120].) Neil's proposed "prenatal relationship" theory views the relationship from the alleged father's perspective, not the child's, and thus does not advance the policy considerations recognizing the value *to the child* of an established parent-child relationship. (*Craig L., supra*, 125 Cal.App.4th at p. 51 [focusing on importance to the child of actual parental relationship]; see *Dawn D., supra*, 17 Cal.4th at pp. 941, 942 [requiring an "actual personal relationship" to permit due process to preclude the application of California's paternity laws]; *Lisa I. v. Superior Court, supra*, 133 Cal.App.4th at p. 614 [the "overarching consideration in deciding if due process precludes the application of paternity laws in a given situation is whether 'an *existing* father-child relationship' between the unwed biological father and the child will be affected," citing *Brian C. v. Ginger K.* (2000) 77 Cal.App.4th 1198, 1200, 1207–1216 [92 Cal.Rptr.2d 294]]; *Craig L., supra*, 125 Cal.App.4th at p. 47

---

[7] The *Dawn D.* court pointed to the *Michael H.* dissent's statement: " '[A]though an unwed father's biological link to his child does not, in and of itself, guarantee him a constitutional stake in his relationship with that child, such a link combined with a substantial parent-child relationship will do so.' " (*Dawn D., supra*, 17 Cal.4th at p. 941, quoting *Michael H. v. Gerald D., supra*, 491 U.S. at pp. 142–143 (dis. opn. of Brennan, J., joined by Marshall, J., & Blackmun, J.).) The *Dawn D.* court also pointed to *Lehr v. Robertson* (1983) 463 U.S. 248 [77 L.Ed.2d 614, 103 S.Ct. 2985], characterizing it as a case in which the court drew "a 'clear distinction between a mere biological relationship and an *actual* relationship of parental responsibility.' " (*Dawn D.*, at p. 942.)

[distinguishing *Dawn D.* where the biological father alleged a "great deal of physical contact" and a "meaningful relationship" with the child, which would give rise not only to the presumption provided by § 7611, subd. (d), but also an interest possibly subject to protection under the due process clause of the U.S. Const.].) Hence, we decline to adopt it.

Neil's claim of obstruction by Mary or even fraud (stemming from Neil's allegations that Mary deceived him into impregnating her and led him to believe he would share in the children's lives) does not bring this case outside of *Dawn D.* The alleged father in *Dawn D.*, as Neil here, made unsuccessful efforts to negotiate visitation and child support and he claimed that the mother had indicated an intent to marry him. In *Dawn D.*, the court placed no importance on the methods or manner by which the mother and/or husband elected to prevent an alleged father from entering into the child's life, and we do not in this case.[8] Nor do we find distinguishing the fact Neil has his own family that is willing to support and care for the children. Our concern is the existence and nature of the child's relationship with the putative father. (*Craig L., supra,* 125 Cal.App.4th at p. 51.)

We find nothing to distinguish *Dawn D.* from the present case. As in *Dawn D.*, Neil here claimed to have conceived the twins with Mary while she was married to her husband, though living apart from him during her deployment. Accordingly, Neil's asserted fundamental liberty interest, carefully described as *Dawn D.* requires, is identical to that of the alleged biological father in *Dawn D.*[9] *Dawn D.* is dispositive, and defeats Neil's claim to a fundamental liberty interest in an opportunity to raise his alleged children.

## B. *Equal Protection*

"There is no constitutional requirement of uniform treatment. [Citations.] Legislative classification is permissible when made for a lawful state

---

[8] This is to be distinguished from the adoption context, in which courts are "concerned with the unequal treatment of natural fathers under the adoption statutes, as compared with mothers and presumed fathers." (*In re Charlotte D.* (2009) 45 Cal.4th 1140, 1147 [90 Cal.Rptr.3d 724, 202 P.3d 1109], citing *Adoption of Kelsey S., supra,* 1 Cal.4th at pp. 823–825.) In that context, so long as a natural father " 'has sufficiently and timely demonstrated a full commitment to his parental responsibilities,' [the] statutory scheme violated the equal protection and due process clauses of the federal constitution to the extent it permitted 'a mother unilaterally to preclude her child's biological father from becoming a presumed father and thereby allowing the state to terminate his parental rights on nothing more than a showing of the child's best interest.' " (*In re Charlotte D.,* at p. 1148, quoting *Kelsey S.,* at p. 849.)

[9] Indeed, Neil describes his asserted liberty interest as "his interest in establishing and maintaining a relationship with his children born to a woman who was married to another man at the time of the children's conceptions and births." This is identical to the asserted interest advanced by the alleged biological father as defined by the California Supreme Court in *Dawn D.*

purpose and when the classification bears a rational relationship to that purpose. [Citations.] 'Wide discretion is vested in the Legislature in making the classification and every presumption is in favor of the validity of the statute; the decision of the Legislature as to what is a sufficient distinction to warrant the classification will not be overthrown by the courts unless it is palpably arbitrary. . . . A distinction in legislation is not arbitrary if any set of facts reasonably can be conceived that would sustain it.' " (*Estate of Horman* (1971) 5 Cal.3d 62, 75 [95 Cal.Rptr. 433, 485 P.2d 785].)

 When legislation involves a suspect classification such as classifications based on race, nationality or alienage, or the disparate treatment has a real and appreciable impact on a fundamental right or interest, a heightened standard of scrutiny is applied. (*Butt v. State of California* (1992) 4 Cal.4th 668, 685–686 [15 Cal.Rptr.2d 480, 842 P.2d 1240]; *Estate of Horman, supra,* 5 Cal.3d at p. 75.) In such cases, legislation will be upheld only if it is shown the state " 'has a *compelling* interest [that] justifies the law' " and " 'that distinctions drawn by the law are *necessary* to further its purpose.' " (*Darces v. Woods* (1984) 35 Cal.3d 871, 885 [201 Cal.Rptr. 807, 679 P.2d 458]; *In re Mary G.* (2007) 151 Cal.App.4th 184, 198–199 [59 Cal.Rptr.3d 703].)

Neil asks this court to hold unconstitutional section 7611, subdivision (d) under the federal and state equal protection clauses (U.S. Const., 14th Amend., § 1; Cal. Const., art. I, § 7), because it treats married fathers differently than unmarried fathers. Arguing "[m]arital status is a suspect classification," Neil contends the state has no compelling interest in the welfare of children that outweighs the interest of an unwed biological father or the child's interest in maintaining the father-child relationship, nor does the state have more interest in the welfare of children of divorced parents versus those of unmarried parents. He argues he is similarly situated to divorced fathers in California; that "unwed biological fathers should be entitled to the same rights and obligations as formerly-married-now-divorced biological fathers."

 We agree with respondent that Neil's equal protection challenges are as a threshold matter waived for failure to raise them in the trial court. " 'Typically, constitutional issues not raised in earlier civil proceedings are waived on appeal.' " (*Fourth La Costa Condominium Owners Assn. v. Seith* (2008) 159 Cal.App.4th 563, 585 [71 Cal.Rptr.3d 299], quoting *Bettencourt v. City and County of San Francisco* (2007) 146 Cal.App.4th 1090, 1101 [53 Cal.Rptr.3d 402].) Neil provided no points and authorities in support of his original petition to establish paternity, and he did not in his accompanying declaration discuss any constitutional provisions or violations. In opposition to respondent's motion to quash, Neil made various arguments without directly suggesting an equal protection challenge, though he did argue

respondent's marriage should not be given "priority" over his marriage.[10] His arguments are too tenuous, in our view, to make an arguable equal protection claim in the trial court. (See *Hale v. Morgan* (1978) 22 Cal.3d 388, 394 [149 Cal.Rptr. 375, 584 P.2d 512].)

Even if we were to consider Neil's equal protection challenge a pure question of law presented by undisputed facts (*Hale v. Morgan, supra,* 22 Cal.3d at p. 394), we would reject it. We have not been provided authority for the proposition that marital status is a suspect classification requiring a heightened level of scrutiny. We have already determined, based on *Dawn D., supra,* 17 Cal.4th 932, that Neil's asserted interest "in establishing a relationship with his child born to a woman married to another man at the time of the child's conception and birth" (*id.* at p. 941) is not a constitutionally protected fundamental right or interest. Accordingly, we perceive no basis to apply a strict scrutiny standard that would look to the state's compelling interest that justifies the law. Neil does not contend that either an intermediate (*Kenneally v. Medical Board* (1994) 27 Cal.App.4th 489, 495, fn. 4 [32 Cal.Rptr.2d 504]) or rational basis standard should be applied.

Finally, we decline to address Neil's equal protection challenge to section 7612, subdivision (a), which is premised on the circumstance of Neil reaching presumed father status. As we have explained above (*ante,* pt. II.), Neil cannot be a presumed father under the UPA. We conclude Neil lacks standing to raise an equal protection challenge because he has not suffered the disparate treatment he hypothesizes. (See *People v. Garcia* (1999) 21 Cal.4th 1, 11 [87 Cal.Rptr.2d 114, 980 P.2d 829]; *People v. Superior Court (Manuel G.)* (2002) 104 Cal.App.4th 915, 934 [128 Cal.Rptr.2d 794].)

---

[10] Neil argued based on section 7570 the state had a compelling interest in establishing the paternity of all children, and that the children in the present case would lose substantial financial benefits if his paternity was not established. He pointed out respondent refused to submit to genetic testing. He submitted that the marital presumption did not apply. He argued the state's public policy was best served by determining the children's true paternity; that "[t]he public policy in favor of marriage, if one considers the fact that there are two intact marriages and two families available to provide support, love and guidance to the [children], favors [Neil] . . . ." Neil argued he was a presumed father and he was entitled to his "day in court" to determine his presumed father status. He attempted to distinguish *Dawn D., supra,* 17 Cal.4th 932, pointing out the father there was an unwed father, not a married father with a family "ready, willing and able" to help raise the children. Neil argued, "If the purpose of protecting marriages is to provide a stable home environment for the children, then the existence of two marriages and families is a factor which the Court must consider. There is no case that says a marriage like [Mary's] has priority over a marriage like [Neil's]. The Court necessarily must examine the nature of the marital relationships and quality of the home environments each set of parents can provide for the [children]."

## DISPOSITION

The order is affirmed.

Haller, Acting P. J., and McDonald, J., concurred.

Appellant's petition for review by the Supreme Court was denied November 30, 2011, S197535.