[No. B236047. Second Dist., Div. Eight. Dec. 21, 2012.]

J.R., Plaintiff and Respondent, v.
D.P. et al., Defendants and Appellants.

**COUNSEL**

Kimberly A. Knill for Defendants and Appellants.

Orren & Orren and Tyna Thall Orren for Plaintiff and Respondent.

OPINION

GRIMES, J.—

## SUMMARY

This is a paternity action in which the court found two men to be presumed fathers of the child, and concluded that the biological father's presumption of paternity, under the particular circumstances, was controlling, as it was "the presumption which on the facts [was] founded on the weightier consider-ations of policy and logic . . . ." (Fam. Code, § 7612, subd. (b).) The mother and the other presumed father appeal this ruling. They also assert the biological father had no standing to bring the paternity action in the first place because he was not a presumed father when he filed the suit, and they further contend the trial court erred when it set aside a voluntary declaration of paternity by the other presumed father.

We affirm the judgment.

## FACTS

On August 11, 2010, J.R. (plaintiff) filed a petition, in propria persona, to establish a parental relationship with a child born four months earlier, on April 12, 2010. Plaintiff's petition sought visitation and asked that the child's surname be changed to plaintiff's last name and that plaintiff be named as the father on the child's birth certificate. Plaintiff and the mother of the child had an intimate sexual relationship which, according to plaintiff, began in Decem-ber 2003. The mother said it began (and ended) in July 2009, but in any event, the parties were intimate in July 2009, when the child was conceived. At that time, plaintiff was married to another woman with whom he had two children, and the mother was living with and having sexual relations with R.M., who was named as father on the child's birth certificate. The child's mother (mother) had been living with R.M. since 2005.

Mother discovered she was pregnant in August 2009. She thought R.M. was the father. She told plaintiff she was pregnant three months later. In late November 2009, she and plaintiff had testing done at the University of California at Los Angeles (UCLA) to determine if plaintiff was the father of the child. The results, received in December 2009, showed plaintiff was the father. Mother discussed the results with plaintiff in early January 2010, but she continued to believe R.M. was the father, because plaintiff told her "the child could not be his because he had had an operation" and that the tests "weren't always accurate until the child was born." Mother said that plaintiff tried to speak with her during the two months after they learned of the test

results, but she told him not to call her anymore and did not respond to his phone calls. Mother changed her telephone number and did not give her new number to plaintiff.

The child was born on April 12, 2010. R.M. thought he was the biological father of the child. R.M. was named as the father on the birth certificate, and mother and R.M. signed a voluntary declaration of paternity at the hospital on April 12, 2010. The declaration contains, among other things, a statement by R.M. that he is the biological father of the child, and a statement by mother that "the man who has signed the voluntary declaration of paternity is the only possible father . . . ." (Fam. Code, § 7574, subd. (b)(5).) (All further statutory references are to the Family Code.) The child has lived with R.M. and mother since his birth, and R.M. has always treated him as his son.

Several months after the child's birth, R.M. learned about the DNA test results from plaintiff's wife. R.M. confronted mother, who told him that the DNA test results showed that plaintiff was the biological father. R.M. was upset and angry with mother. When R.M. was asked if he would have signed the voluntary declaration of paternity if he had known the DNA test results showed plaintiff was the father, he said that he "would have waited until the child was born and then done a test with my blood after he was born."

The paternity action plaintiff filed in August 2010 developed as follows.

At the first hearing, on September 30, 2010, plaintiff said mother knew he was the biological father because of the DNA test, and asked for an order allowing him to see the child. Mother took the position that the voluntary declaration of paternity established R.M. was the father, and had the effect of a judgment, so that unless it was set aside in a separate action, plaintiff could not obtain any visitation or custody orders. Mother did not accept the validity of the DNA test results and wanted another DNA test now that the child was born. R.M. said he believed that mother had tricked him and lied to him about whether he was the father, but he loved the boy, was with mother throughout her pregnancy and at the child's birth, and that he was the legal father of the boy.

The court ruled plaintiff had standing to bring the paternity petition and obtain orders, and the court had jurisdiction to make orders. The court made no temporary visitation orders that day, but appointed counsel for the child. The court said that plaintiff could see the child soon, and the first meetings would be at the offices of counsel for the child.

Mother and R.M. married on October 22, 2010.

On November 12, 2010, the child's counsel filed his report. Counsel conducted lengthy interviews of mother, R.M., plaintiff, and plaintiff's wife,

and recommended that the court grant plaintiff's petition and award joint legal custody to plaintiff and mother, with primary physical custody to mother and visitation to plaintiff.

At the second hearing, on November 16, 2010, the parties stipulated to various matters, which became temporary orders of the court. The stipulation and orders included shared physical custody (with plaintiff having custody at stated times on specified Wednesdays and Saturdays) and an agreement to further DNA tests for R.M., the child, and plaintiff.

At the third hearing, on January 10, 2011, mother moved to vacate the order under which the parties stipulated to paternity testing, claiming plaintiff had no standing to seek DNA testing. The motion was denied, and mother was ordered to comply with the previous stipulation and order for DNA testing.

On May 4, 2011, plaintiff moved to set aside R.M.'s voluntary declaration of paternity, on the ground mother "committed perjury" when she signed the declaration stating no other person could be the biological father, and on the ground that the blood tests after birth showed R.M. was not the biological father.

Trial began in June 2011 on the validity of R.M.'s voluntary declaration of paternity, and continued for several days until July 1, when the court found the voluntary declaration was not valid and did not establish paternity. The court reasoned that the voluntary declaration of paternity was invalid because mother declared under penalty of perjury facts she knew were untrue, and mother's testimony to the effect that she believed R.M. was the father was wholly unreliable.

Trial resumed in late July. The following day, the parties agreed, and the court ordered, that plaintiff was the biological father of the child, subject to a third DNA test that would be performed under the procedures and admissibility standards specified in the Family Code. (See § 7552.5.)

Trial continued for several days on the issue of who was the presumed father. At various stages in the trial, plaintiff testified about his efforts to help mother and to see his child. When mother told plaintiff in August 2009 that she was pregnant, his reaction "was honestly to assume my responsibility if I needed to because of the love that I used to have for her. I couldn't do less than that. You know, I wasn't going to leave her hanging there." Plaintiff went with mother to confirm her pregnancy at a clinic in Inglewood. When mother later had abdominal pain, plaintiff took her to a clinic in Paramount and paid for her consultation. After they took the DNA tests at UCLA (which

plaintiff said was mother's idea), plaintiff said he "[s]upport[ed] [mother] emotionally and economically too." He "made a few deposits to her bank account," but did not have the receipts.

After they received the DNA test results, mother told plaintiff she wanted to tell R.M. by herself, so plaintiff gave her some time to do so, and did not call R.M. or otherwise interfere for about two months. He was worried about mother's emotional state and about the child, and "didn't want it to cause her any kind of pressure in her mind that would lead her to try to have an abortion." (In 2005, plaintiff and mother went to a clinic where mother had an abortion; she said R.M. was responsible for that pregnancy.) After that, plaintiff tried to communicate with mother, but was unable to do so. He went to her place of work, but "had no luck spotting her," and "left her a note on her car asking her to please contact [him]." He called her sister, who was also plaintiff's friend, "many, many times" between January and April or May 2010. He did so because he had no way to reach mother, who had changed her telephone number. He wanted to know when his son would be born and how mother was doing, but "she blocked that information from me." Mother's sister told plaintiff she would not permit plaintiff to do anything that might risk breaking up mother's relationship with R.M. She admitted that plaintiff called her many times wanting to see mother and the child.

Plaintiff did not go to mother's house because she was living with R.M. and he did not want to provoke a violent reaction. He tried to reach R.M., but R.M. did not return his calls. In May 2010, he sent a letter to mother, but it was returned as undeliverable. In the second week of June, he found out the child had been born. When asked how he found out, plaintiff said that his wife told him. He filed his lawsuit four months after the child was born, though he began preparing to file the lawsuit in June 2010.

In August 2011, the court found that both plaintiff and R.M. qualified as presumed fathers under section 7611, subdivision (d) (hereafter section 7611(d)). Under that subdivision, a man is presumed to be the natural father if he "receives the child into his home and openly holds out the child as his natural child." (§ 7611(d).) Plainly, R.M. qualified as a presumed father under section 7611(d). The court reasoned that plaintiff also qualified as a presumed father because he persisted throughout the pregnancy and after the child's birth to secure a relationship with the child but met extensive resistance from mother, who was determined to exclude plaintiff from the child's life. The court addressed the conflicting presumptions and the section 7612 requirement that "the presumption which on the facts is founded on the weightier considerations of policy and logic controls." (§ 7612, subd. (b).)

The court found it would offend basic human rights to deny plaintiff's claim of paternity since plaintiff had taken all reasonable steps to establish his

paternity, yet mother thwarted his efforts by doing everything within her power to prevent him from establishing a parent-child relationship. The court reasoned it would be illogical to, in effect, permit mother to pick and choose who would be the child's father. The court concluded the law should not extinguish a biological relationship with a father who sought to be responsible for the child's needs, solely because R.M. also loved the child, particularly since the vicissitudes of life do not guarantee a lifelong relationship between mother and R.M., in which event the child could be left fatherless. The court acknowledged that recognizing plaintiff's parentage would interfere with the stability of the child's life, but found mother had created a false sense of stability by deceiving R.M. into believing he was the father.

Hearings were held and orders were made on custody and visitation the following week and in late October 2011. On January 11, 2012, judgment was entered finding plaintiff to be the father of the child, making orders on custody and visitation, retaining jurisdiction over the issue of child support, changing the child's last name to plaintiff's last name, amending the birth certificate by adding plaintiff's name and changing the child's last name. The parents were given joint legal custody starting February 8, 2012.

Mother and R.M. filed this appeal on September 13, 2011.

## DISCUSSION

Mother and R.M. contend plaintiff had no standing to bring a paternity action, the trial court erred when it set aside R.M.'s voluntary declaration of paternity, and the trial court abused its discretion when it weighed competing presumptions and "allow[ed] biology to trump family stability." We find no merit in any of these contentions.

■ We begin with a brief description of the interrelated statutes that govern paternity decisions. The Uniform Parentage Act (§ 7600 et seq.) enumerates the circumstances under which a man is presumed to be the natural father of a child. As relevant to this case, a man is presumed to be the natural father if he meets the conditions specified by statute for a voluntary declaration of paternity (§ 7570 et seq.), or if he "receives the child into his home and openly holds out the child as his natural child." (§ 7611(d).) A presumption under section 7611 (here, receiving the child into one's home) "is rebutted by a judgment establishing paternity of the child by another man." (§ 7612, subd. (c).)

■ A voluntary declaration of paternity filed with the Department of Child Support Services (as was done here) has "the same force and effect as a

judgment for paternity issued by a court of competent jurisdiction." (§ 7573; see *Kevin Q. v. Lauren W.* (2009) 175 Cal.App.4th 1119, 1141 [95 Cal.Rptr.3d 477] (*Kevin Q.*) ["Until the voluntary declaration of paternity is set aside, it has the 'force and effect' of a judgment."].) But the voluntary declaration of paternity may be set aside if a court finds that genetic tests performed pursuant to the Uniform Act on Blood Tests to Determine Paternity (§ 7550 et seq.) show that the man who signed the voluntary declaration is not the father of the child. (§ 7575, subd. (b); see *Kevin Q.*, at p. 1138, fn. 13 [§ 7575 "authorizes a court to set aside a voluntary declaration of paternity based on genetic tests ordered in a section 7630 paternity action"].)

■ "Presumed fatherhood status under section 7611 entitles a man to custody of a child. (§ 3010.) 'Although more than one individual may fulfill the statutory criteria that give rise to a presumption of paternity, "there can be only one presumed father." ' " (*Kevin Q.*, *supra*, 175 Cal.App.4th at p. 1131, quoting *In re Jesusa V.* (2004) 32 Cal.4th 588, 603 [10 Cal.Rptr.3d 205, 85 P.3d 2] (*Jesusa V.*).) If two or more paternity presumptions arise under section 7611 that conflict with each other, "the presumption which on the facts is founded on the weightier considerations of policy and logic controls." (§ 7612, subd. (b).)

■ Finally, "[t]here are some circumstances where a man with no marital relationship to the mother, and who has not received the child into his home, may be declared a presumed father under principles of due process and equal protection if he has been prevented by the mother or by third parties from physically receiving the child into his home." (*In re D.M.* (2012) 210 Cal.App.4th 541, 545 [148 Cal.Rptr.3d 349].) In *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 [4 Cal.Rptr.2d 615, 823 P.2d 1216] (*Kelsey S.*), the court held that the statutory scheme governing paternity decisions "violates the federal constitutional guarantees of equal protection and due process for unwed fathers *to the extent that* the statutes allow a mother unilaterally to preclude her child's biological father from becoming a presumed father and thereby allowing the state to terminate his parental rights on nothing more than a showing of the child's best interest. If an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities— emotional, financial, and otherwise—his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent. Absent such a showing, the child's well-being is presumptively best served by continuation of the father's parental relation- ship. Similarly, when the father has come forward to grasp his parental responsibilities, his parental rights are entitled to equal protection as those of the mother." (*Id.* at p. 849.)

## 1. *The Standing Issue*

Defendants contend that, as a matter of law, plaintiff had no standing under section 7630 to bring a paternity action, because he "did not qualify as a presumed father when he filed this action" in August 2010. (Initial capitalization omitted.) Defendants cite section 7630, and rely on *Dawn D. v. Superior Court* (1998) 17 Cal.4th 932 [72 Cal.Rptr.2d 871, 952 P.2d 1139] (*Dawn D.*), and two Court of Appeal cases following it. We are not persuaded.

First, section 7630, as it reads today (and as it read as of Jan. 1, 2011), would give plaintiff standing: "[A]n action to determine the existence of the father and child relationship may be brought by . . . a man alleged or alleging himself to be the father . . . ." (§ 7630, subd. (c).) This provision was not in effect in August 2010 when plaintiff sued. At that time, section 7630, former subdivision (c), provided only for an action to determine the existence of a father and child relationship "with respect to a child who has no presumed father under Section 7611 . . . ."[1] (§ 7630, former subd. (c); Stats. 2008, ch. 534, § 3, eff. Jan. 1, 2009.) Defendants argue the section 7630 standing provision should not be applied retroactively, but, in practical effect, there is no retroactive application in this case. While the court found standing on September 30, 2010, before the provision was amended, its substantive rulings in the case all occurred after January 1, 2011. And, if the court had ruled on September 30 that plaintiff had no standing, plaintiff had only to refile his case 90 days later, after January 1, 2011, when the amended provision became effective, as there are no time constraints on when such an action may be brought. (See Stats. 2010, ch. 588, § 1; Legis, Counsel's Dig., Assem. Bill No. 2020 (2009–2010 Reg. Sess.) ["[t]his bill would . . . provide that a man may bring an action at any time to establish that he is the father of a child"].)

Second, even without the statutory amendment, there is persuasive authority supporting the trial court's ruling on standing. In *Gabriel P. v. Suedi D.* (2006) 141 Cal.App.4th 850 [46 Cal.Rptr.3d 437] (*Gabriel P.*), the court held that a man who "did not satisfy the factual predicates for the status of presumed father" was nevertheless "entitled to establish his paternity because [the mother] had precluded him from becoming a presumed father." (*Id.* at p. 859; see *Michael M. v. Giovanna F.* (1992) 5 Cal.App.4th 1272, 1285 [7 Cal.Rptr.2d 460] (*Michael M.*) [holding that "where unwed parents conceive,

---

[1] Under other subdivisions, section 7630 allows only the child, the mother, and a presumed father under section 7611, subdivisions (a), (b), and (c)—presumptions arising from marriage or attempted marriage before and after the child's birth—to bring an action to declare the existence of the father and child relationship (§ 7630, subd. (a)(1)), and allows "[a]ny interested party" to bring a paternity action based on the section 7611(d) "holding out" presumption. (§ 7630, subd. (b).)

and the mother marries another before the birth of the child, the biological father's substantive due process right to a relationship with his child requires that he be allowed standing under the [Uniform Parentage Act] to attempt to establish his paternity of the child, so long as he has promptly taken sufficient steps to preserve his interest"].)

Both *Gabriel P.* and *Michael M.* relied on the Supreme Court's analysis in *Kelsey S.* and involved similar facts, most importantly a husband who married the mother after the child was conceived, a biological father who diligently sought to assert his parental rights, and the mother and/or third parties denying him the right to do so. (See *Gabriel P., supra,* 141 Cal.App.4th at pp. 859–860 & *Michael M., supra,* 5 Cal.App.4th at p. 1277.)

█ *Gabriel P.* explained: "(1) under the circumstances alleged, the [biological father] had a constitutionally protected interest in the opportunity to develop a relationship with the child, and (2) this interest was not outweighed by the state's interest in preserving families—as expressed, for example, in the conclusive presumption of paternity—because no 'marriage family' had existed when the child was conceived. [Citation.] . . . [The biological father] must be permitted standing under the [Uniform Parentage] Act to establish his paternity, and to rebut the husband's competing presumption of paternity." (*Gabriel P., supra,* 141 Cal.App.4th at p. 860; see *In re M.C.* (2011) 195 Cal.App.4th 197, 212–213 [123 Cal.Rptr.3d 856] [unwed father may assert constitutional paternity rights as a "quasi-presumed, or '*Kelsey S.*' father" even if he does not qualify for a statutory presumption under § 7611, where he comes forward at first opportunity but is prevented from asserting parental rights by unilateral conduct of mother or interference by third parties].)

Third, the cases on which defendants rely do not support their contention that plaintiff has no standing to bring this paternity action under section 7630.

In *Dawn D.,* the Supreme Court stated that the Uniform Parentage Act "restricts standing to challenge the presumption of a *husband's* paternity to the child, the child's natural mother, or a presumed father." (*Dawn D., supra,* 17 Cal.4th at p. 937, original italics.) In *Dawn D.,* the mother was married and the child was conceived while she was separated from her husband and living with the alleged biological father; the mother then returned to her husband, and the alleged biological father brought the paternity action a few months later, before the child was born. (*Id.* at p. 936.) The alleged biological father did not meet any of the statutory criteria for presumed father status, and instead relied on an asserted constitutional liberty interest "not to be denied the opportunity to establish a parental relationship with the child." (*Id.* at p. 935.)

*Dawn D.* concluded the alleged biological father had "no constitutionally protected liberty interest defeating California's statutory presumption favoring the husband" (*Dawn D., supra,* 17 Cal.4th at p. 935), that is, no liberty interest "in establishing a relationship with his child born to a woman married to another man at the time of the child's conception and birth." (*Id.* at p. 941.) The Uniform Parentage Act thus precluded an alleged biological father "from bringing this paternity action and, therefore, from compelling [the mother] and the child to submit to blood tests to resolve the question of biological parenthood." (17 Cal.4th at p. 938.)

In this case, unlike *Dawn D.,* mother was *not* married to R.M. when the child was conceived (July 2009), when the child was born (Apr. 2010), or when plaintiff brought the paternity action (Aug. 2010). Indeed, in *Dawn D.,* the court observed that *Kelsey S.* "concerned a child born to two unwed parents, not, as here, a child born into a marriage." (*Dawn D., supra,* 17 Cal.4th at p. 943; see *Gabriel P., supra,* 141 Cal.App.4th at p. 861 ["*Dawn D.* thus addresses an interest materially different from the interests at stake in *Michael M.* and the case before us."].)

Defendants also cite two Court of Appeal cases. But both of those cases, like *Dawn D.,* involve marital presumptions and children conceived during the mother's marriage. *Lisa I. v. Superior Court* (2005) 133 Cal.App.4th 605 [34 Cal.Rptr.3d 927] (*Lisa I.*) involved a child "conceived while the mother was married but separated from her husband, . . . born after the mother's divorce, and . . . being raised by the mother and ex-husband, along with their two other children."[2] (*Lisa I.,* at p. 610.) *Neil S. v. Mary L.* (2011) 199 Cal.App.4th 240 [131 Cal.Rptr.3d 51] (*Neil S.*) involved an alleged biological father who sought to establish a parent-child relationship with twins conceived and born to the mother while she was married to another man, who

---

[2] The *Lisa I.* court found the alleged biological father had no statutory standing under section 7630 to file an action to determine paternity, as section 7630, subdivision (a) " 'restricts standing to challenge the presumption of a *husband's* paternity to the child, the child's natural mother, or a presumed father.' " (*Lisa I., supra,* 133 Cal.App.4th at p. 613, italics added, quoting *Dawn D., supra,* 17 Cal.4th at pp. 937–938.) *Lisa I.* rejected the biological father's claim of a protected liberty interest, citing *Dawn D.* and emphasizing that a biological father without an existing personal relationship with a child has no such liberty interest. (*Lisa I.,* at pp. 616, 617.) The court stated that the alleged biological father "made no substantial efforts to establish a parent-child relationship with [the child] or provide for his or [the mother's] support." (*Id.* at p. 616.) The court also concluded that "the so-called 'opportunity interest' " claimed by the alleged biological father in *Lisa I.* "is significantly limited, if it exists at all, to those situations where the marital parents are either dead [citation] or have relinquished an interest in the child by placing the child for adoption by third persons (*Kelsey S.*)." (*Lisa I.,* at p. 622.)

had accepted the children as his own. The court found "nothing to distinguish *Dawn D.* from the present case."[3] (*Neil S.*, at p. 253.)

Neither *Lisa I.* nor *Neil S.* applies here, as this case does not involve "marital parents" or any marital presumption; mother and R.M. did not marry until after this action was filed. (See *Gabriel P.*, *supra*, 141 Cal.App.4th at p. 861, fn. 5 [distinguishing "[t]he unusual situation in *Lisa I.*" from the facts in *Gabriel P.*, and noting that in *Lisa I.*, "the child's divorced parents intended to raise it jointly with their two other children, and thus there was a cognizable 'existing relationship'—albeit not a 'fully intact family'— involving the parents and the three children"], citing *Lisa I.*, *supra*, 133 Cal.App.4th at pp. 616–619.)

In sum, plaintiff has standing—either under section 7630, subdivision (c), as it exists today, or by virtue of the principles stated in *Kelsey S.* and applied in *Gabriel P.* The standing restrictions stated in *Dawn D.* apply to presumptions of a husband's paternity, and do not apply here.

## 2. *R.M.'s Voluntary Declaration of Paternity*

As noted above, a presumption of paternity under section 7611 "is rebutted by a judgment establishing paternity of the child by another man" (§ 7612, subd. (c)), and a voluntary declaration of paternity has the force and effect of a judgment, unless and until it is set aside. (§ 7573; *Kevin Q.*, *supra*, 175 Cal.App.4th at p. 1141.) But section 7575 "authorizes a court to set aside a voluntary declaration of paternity based on genetic tests ordered in a section 7630 paternity action." (*Kevin Q.*, at p. 1138, fn. 13.)

Defendants contend the trial court erred in setting aside R.M.'s voluntary declaration of paternity. Their theory is that a voluntary declaration of paternity may be set aside only on the ground of extrinsic fraud, not intrinsic fraud. So, they reason, even if the facts as found by the trial court are true—namely, that mother "chose, when she signed [the voluntary declaration of paternity] under the penalty of perjury, to sign it knowing that her statement was not true"—plaintiff did not establish "extrinsic fraud." (See *In re William K.* (2008) 161 Cal.App.4th 1, 10 [73 Cal.Rptr.3d 737] ["an

---

[3] *Neil S.* rejected the alleged biological father's claim of obstruction or fraud by the mother, concluding that *Dawn D.* "placed no importance on the methods or manner by which the mother and/or husband elected to prevent an alleged father from entering into the child's life, and we do not in this case." (*Neil S.*, *supra*, 199 Cal.App.4th at p. 253.) The court distinguished this position from the adoption context of *Kelsey S.*, where a mother cannot unilaterally preclude the biological father from becoming a presumed father, saying that *Kelsey S.* was " 'concerned with the unequal treatment of natural fathers under the adoption statutes, as compared with mothers and presumed fathers.' " (*Neil S.*, at p. 253, fn. 8, quoting *In re Charlotte D.* (2009) 45 Cal.4th 1140, 1147 [90 Cal.Rptr.3d 724, 202 P.3d 1109].)

equitable collateral attack on the [voluntary declaration of paternity] is available on the grounds of extrinsic fraud," among other means of setting the declaration aside, but the "[biological father] recognizes that intrinsic, not extrinsic fraud is what he alleges occurred"].)

■ We see no reason to embark on a lengthy discussion of extrinsic versus intrinsic fraud, as there were other legal bases that support the trial court's decision to set aside the voluntary declaration of paternity. Defendants fail to recognize that extrinsic fraud is only one of "five scenarios" for setting aside a voluntary declaration of paternity. (*In re William K., supra*, 161 Cal.App.4th at pp. 9–10.) One of these, as *William K.* points out, is that "a court may order genetic testing in a 'proceeding in which paternity is a relevant fact.' " (*Id.* at p. 9, citing § 7551.) And, if those tests show the man who signed the voluntary declaration of paternity is not the father of the child, the court may set aside the voluntary declaration. (§ 7575, subd. (b)(1).)[4] Here, plaintiff filed a paternity action, the parties agreed to genetic tests, and the tests showed R.M. was not the father. Plaintiff then sought to set aside the voluntary declaration of paternity, on the grounds both that mother had lied about R.M. being the only possible father, and the blood tests showed R.M. was not the father. Under those circumstances, the court had the authority to set aside the voluntary declaration of paternity.

It is true, as defendants point out, that the trial court erred when it placed the burden on R.M. to prove that the voluntary declaration of paternity "meets statutory requirements." Section 7575 provides that the parent "seeking to set aside the voluntary declaration of paternity shall have the burden of proof." (§ 7575, subd. (c)(2).) But this is not a case where the evidence was in equilibrium; the court clearly found mother's testimony "absolutely incredible to believe," and invalidated the declaration on that basis. Defendants could not have been prejudiced by the trial court's error.

---

[4] *In re William K., supra*, 161 Cal.App.4th 1, stated that the biological father was "not one of the designated parties who may bring a motion for genetic testing in order to set aside a [voluntary declaration of paternity] pursuant to . . . section 7575, subdivision (b)." (*Id.* at p. 9, citing *In re Christopher M.* (2003) 113 Cal.App.4th 155, 164 [6 Cal.Rptr.3d 197].) We disagree with that reading of section 7575, subdivision (b). *In re Christopher M.* stated that "with *limited exceptions not applicable here*, a motion for testing may be brought only by a child support agency, the child's mother, or the man who signed the voluntary declaration." (113 Cal.App.4th at p. 164, italics added.) Section 7575, subdivision (b)(3)(A) reads in full: "The notice of motion for genetic tests under this section may be filed not later than two years from the date of the child's birth by a local child support agency, the mother, the man who signed the voluntary declaration as the child's father, *or in an action to determine the existence or nonexistence of the father and child relationship pursuant to Section 7630* or in any action to establish an order for child custody, visitation, or child support based upon the voluntary declaration of paternity." (Italics added.)

### 3. *The Court's Resolution of Competing Presumptions Under Section 7612*

The trial court found both plaintiff and R.M. to be presumed fathers under section 7611(d), and resolved the conflicting presumptions in plaintiff's favor. In their opening brief, defendants contend the court abused its discretion when it weighed the competing presumptions of paternity and "allow[ed] biology to trump family stability." We find no abuse of discretion here.

As set forth above, more than one individual may meet the statutory criteria giving rise to a presumption of paternity, but there can be only one presumed father. (*Jesusa V., supra*, 32 Cal.4th at p. 606.) "[I]n cases involving competing presumptions under section 7611, the trial court must identify the presumption 'which on the facts is founded on the weightier considerations of policy and logic.' " (*Gabriel P., supra*, 141 Cal.App.4th at p. 864, quoting § 7612, subd. (b).) This is an issue entrusted to the trial court's discretion. (*Jesusa V.*, at p. 606.)

██  "[F]or purposes of resolving conflicting presumptions under section 7612, subdivision (b), a *Kelsey S.* father is the equivalent of a statutorily presumed father. Any other conclusion would render *Kelsey S.* status meaningless." (*In re M.C., supra*, 195 Cal.App.4th at p. 222, fn. 13.) The court is "obliged to weigh all relevant factors—including biology—in determining which presumption [is] founded on weightier considerations of policy and logic." (*Jesusa V., supra*, 32 Cal.4th at p. 608.)

Before we turn to the question whether the trial court abused its discretion, we note a preliminary issue. In their reply brief, defendants contend the trial court made no finding that plaintiff was a *Kelsey S.* father, and that we should not rely on an implied finding to that effect. They say the court "found plaintiff was a presumed father under section 7611[d], not a *Kelsey S.* father," and that the section 7611(d) presumption requires that plaintiff "receive[] the child into his home," which plaintiff did not do.

We reject this contention. The record could not reflect more clearly that the trial court was applying a *Kelsey S.* analysis, and that plaintiff did not meet the section 7611(d) statutory presumption—in that he did not receive the child into his home—only because mother prevented him from doing so. Defendants assert that plaintiff "did not argue the [*Kelsey S.*] issue at the hearing in the court below," but the record shows otherwise. In one filing, plaintiff argued that he was "not just a biological father. . . . He took all the reasonable steps to bring the child into his home, and is similar to the father[] in [*Kelsey S.*] . . . . I[n] [*Kelsey S.*] the court found a federal constitutional right in a presumed father[']s relationship with his child." Further, plaintiff cited and quoted *In re Jerry P.* in arguing that plaintiff should not be penalized for not having more contact with the child when mother prevented him from doing so: "Here, our Supreme Court [in *Kelsey S.*] has already

made the decision the statutory scheme for determining presumed father status is constitutionally flawed 'to the extent that the statutes allow a mother unilaterally to preclude her child's biological father from becoming a presumed father . . . .' " (*In re Jerry P.* (2002) 95 Cal.App.4th 793, 816 [116 Cal.Rptr.2d 123].)

Defendants also assert in their reply brief that the evidence shows plaintiff did not qualify as a *Kelsey S.* father, and that the *Kelsey S.* factors "are not pertinent in cases not involving adoption." The latter claim is simply not so. (See, e.g., *Gabriel P., supra*, 141 Cal.App.4th 850 [paternity action]; *In re M.C., supra*, 195 Cal.App.4th 197 [dependency].) And our earlier recitation of the evidence and the trial court's analysis shows that plaintiff did indeed qualify as a *Kelsey S.* father. Plaintiff "promptly stepped forward to assume full parental responsibilities for his child's well-being" (*In re M.C.*, at p. 220), both before and after the birth. He took mother for prenatal care before the birth, he was thwarted by mother from having any contact with her and the child before and after the birth, and he took prompt legal action to seek custody. This is substantial evidence supporting the trial court's finding plaintiff was a presumed father.

As for the court's resolution of the competing paternity presumptions in plaintiff's favor, we find no abuse of discretion. The issue is which father's presumption of paternity "on the facts is founded on the weightier considerations of policy and logic." (§ 7612, subd. (b).) In weighing the conflicting interests, "the trial court must in the end make a determination which gives the greatest weight to [the child's] well-being." (*Craig L. v. Sandy S.* (2004) 125 Cal.App.4th 36, 53 [22 Cal.Rptr.3d 606]; see *id.* at p. 52 (*Craig L.*) ["no single factor—whether social or biological—controls resolution of the conflict between competing presumed fathers"].) Here, the trial court clearly believed that both men loved the child and would be good fathers, and that it was "illogical" to allow mother, in effect, to "pick and choose who the father's going to be." The court thought it was in the child's best interest to know his biological father, in circumstances where that father "did everything within his power to establish parentage."

Defendants cite a number of cases telling us that, "in applying paternity presumptions, . . . the extant father-child relationship is to be preserved at the cost of biological ties." (*Steven W. v. Matthew S.* (1995) 33 Cal.App.4th 1108, 1116 [39 Cal.Rptr.2d 535] (*Steven W.*).) *Steven W.* explains: "The paternity presumptions are driven by state interest in preserving the integrity of the family and legitimate concern for the welfare of the child. The state has an ' "interest in preserving and protecting the developed parent-child . . . relationships which give young children social and emotional strength and stability." ' " (*Ibid.*)

But this is not a case where R.M. had a "developed parent-child . . . relationship[]" (*Steven W., supra,* 33 Cal.App.4th at p. 1116) of the kind described in those cases, when plaintiff filed this suit. Plaintiff filed this action when the child was four months old, and began regular visits with the child at plaintiff's home in November 2010, when the child was seven months old, so that plaintiff, too, has a relationship with the child. In *Steven W.,* the nonbiological father "participated in all aspects of [the child's] emotional and financial support for the first four years of the child's life," while the biological father "acquiesced in [the competing father's] assumption of the role of father in [the child's] life." (*Steven W.,* at p. 1117; see *id.* at p. 1116 [" ' " '[I]n the case of an older child [over two years of age] the familial relationship . . . is considerably more palpable than the biological relationship . . . .' " ' "].) *Steven W.* concluded the trial court "did not err in finding that the conflict between the presumptions weighed in favor of [the nonbiological father]." (*Id.* at p. 1117.)

In short, defendants have not shown anything improper in the trial court's weighing of the competing presumptions. Defendants claim that mother's " 'fraud' " and plaintiff's biology are "irrelevant to the competing presumptions," but that is simply not so. *Jesusa V.* teaches that the court need not accord determinative weight to biology (*Jesusa V., supra,* 32 Cal.4th at p. 607), but also instructs that the court may consider "*every* relevant consideration of policy and logic," and is "obliged to weigh all relevant factors—including biology—in determining which presumption was founded on weightier considerations of policy and logic." (*Id.* at p. 608.)

██ A court is not *required* to rely on biological paternity " 'where the weight of the interests of the competing presumptive fathers are in relatively equal balance . . . .' " (*Jesusa V., supra,* 32 Cal.4th at p. 609 [". . . *Kiana A.* stated only that biological paternity *might* be relied upon to determine paternity where the interests are otherwise in relatively equal balance, not . . . that it *must* be so used."].) But we see no error in the court's use of the biology factor in this case. In the end, the court's determination must "give[] the greatest weight to [the child's] well-being" (*Craig L., supra,* 125 Cal.App.4th at p. 53), and that is what the court did. With plaintiff as the presumed father, the child will continue to have two loving families, both of which are currently a part of his life. If R.M. were found to be the presumed father, mother has left no doubt that plaintiff would have no part in the child's life. Under these circumstances, and given the fact that the biological connection between father and child "is unique and worthy of constitutional protection if the father grasps the opportunity to develop that biological connection into a full, and enduring relationship" (*Kelsey S., supra,* 1 Cal.4th at p. 838), we cannot say the trial court abused its discretion when it designated plaintiff the presumed father of the child.

## DISPOSITION

The judgment is affirmed. Plaintiff shall recover his costs on appeal.

Bigelow, P. J., and Rubin, J., concurred.

Appellants' petition for review by the Supreme Court was denied April 10, 2013, S208384.