Filed 9/3/13  In re M.T. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re M.T., a Person Coming Under the Juvenile Court Law. | |
| J.R.,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>SAN FRANCISCO HUMAN SERVICES AGENCY et al.,<br><br>        Defendants and Respondents. | A133991<br><br>(San Francisco County<br>  Super. Ct. No. JD103394) |

In this dependency proceeding, the juvenile court ruled that A.S. was the presumed father of the child M.T. and J.R. was the de facto parent of the child.  J.R. now appeals, arguing that the court abused its discretion in finding that A.S. was the presumed father of the child.  We affirm.

**FACTS[1]**

On December 6, 2010, the San Francisco Human Services Agency (the agency) filed a Welfare and Institutions Code section 300 petition seeking to have then five-year-old M.T. declared a dependent based on, among other things, the failure of mother to care for the child.  At the time of the child's detention, mother was living in a shelter and had been previously living with J.R., who was the presumed father of M.T.'s older half-

_____

[1]      We recite only those facts as are necessary to give context to the issues raised on this appeal.

1

sibling.  M.T.'s birth certificate did not list a father, but mother reported she thought the child's biological father was A.S.  Mother stated A.S. never paid any support and did not know M.T., and the child only knew J.R. who held out M.T. to be his own child.  On February 2, 2011, the juvenile court took jurisdiction over M.T. after sustaining the failure to protect allegations against mother.  After a dispositional hearing on March 22, 2011, the juvenile court declared M.T. to be a dependent and placed the child with a relative.  The court ordered reunification services for mother and therapeutic visits between the child and A.S.

Thereafter, A.S. and J.R. filed competing motions to elevate their status.  A.S. sought to elevate his status from biological father to a *Kelsey S.* father (*Adoption of Kelsey S.* (1992) 1 Cal.4th 816), arguing that mother had consistently interfered with his efforts to establish his paternity of the child.  J.R. sought to elevate his status to presumed father on the ground he had received M.T. into his home and openly held the child out as his own (Fam. Code, § 7611, subd. (d)[2]).  On April 28, 2011, after a hearing, the juvenile court resolved the outstanding motions by granting A.S.'s motion for *Kelsey S.* status and denying J.R.'s motion for presumed father status without prejudice.  Five months later, on September 6, 2011, J.R. renewed his motion for presumed father status.  A.S. also filed a motion for presumed father status.

The juvenile court considered evidence on the requests for presumed father status on November 29, and December 2, 2011.  J.R., A.S., six-year-old M.T., and the agency's social worker assigned to the case, testified at the hearings.  The juvenile court found J.R. qualified as a presumed father in that he held M.T. out as his own, considered the child his own, and had behaved in a manner consistent with being a father.  The court also found A.S.'s status as a *Kelsey S.* parent qualified him for presumed father status.

Because " 'there can be only one presumed father' " (*In re Jesusa V.* (2004) 32 Cal.4th 588, 603 (*Jesusa V.*)), the juvenile court weighed the competing fatherhood presumptions, applying the statutory requirement that "the presumption which on the

---

[2]     All further unspecified statutory references are to the Family Code.

2

facts is founded on the weightier considerations of policy and logic controls" (§ 7612, subd. (b)). The court acknowledged J.R. "has taken on the role of father to [the child], held [the child] out as his [child] . . . . He has provided for [the child] on a daily basis when he lived in the home. He was present at [the child's] birth, and obviously loves and cherishes his relationship with [the child]." Nevertheless, the court found that "unlike most of the cases that discuss the extant familial relationship versus mere biology, [A.S.] is not a mere biological father. Nor is this case about establishing biological ties. It is a case in which I must choose which developing parent/child relationship should be preserved and protected. And to do that I turn to the specifics of the case. [¶] When, upon learning that [mother] was pregnant and believing that he might be [the child's] father, [A.S.] made every possible effort to establish his role as father. He offered both personal care and resources for [the child] and was repeatedly rebuffed. But for mother's assurance that [A.S.] was not [the child's] father and her complete resistance to let him participate in [the child's] life, it is clear that [A.S.] would have come forward in an active role much sooner. And in fact, each and every time he had an opportunity to come forward, take responsibility and establish a parental relationship with [the child], [A.S.] has demonstrated his commitment." [¶] . . . While [J.R.] and [mother] were some time ago a family unit, they have not been so for quite some time. [They] split up and [J.R.] left the family home and remained gone for quite some time. The family unit has not been together during the pendency of this dependency action and both [J.R. and mother] confirmed that they have no intention of resuming their relationship. [¶] Finally, given [J.R.'s] alcohol abuse and allegations of domestic violence in the relationship, [J.R.'s] impact on [the child] has been by no stretch without its damaging elements." Because " 'the weight of the interests of the competing father[s] [were] in relatively equal balance,' " the court found " 'biological paternity might properly be relied upon to determine which presumption carries more weight,' " and "the weightier interest in this case favors [A.S.]. He not only is the biological father to [the child], but has demonstrated a desire and ability to care for [the child] and to provide a stable and loving home. While [A.S.] was not a constant part the first years of [the child's] life, that was

3

by no choice of his. By all accounts the visitations between [the child] and [A.S.'s] wife and other children have gone quite well and [the child] has begun to develop a bond with [A.S.]. Finally, once given the opportunity, [A.S.] has received [the child] into his home and has treated [the child] as his own and has developed a bond with [the child]. [¶] I am granting [A.S.] presumed father status."[3] J.R. timely appeals.[4]

## DISCUSSION

"Presumed father status is governed by section 7611, which sets out several rebuttable presumptions under which a man may qualify for this status, generally by marrying or attempting to marry the child's mother or by publicly acknowledging paternity and receiving the child into his home." (*In re J.L.* (2008) 159 Cal.App.4th 1010, 1018 (*J.L.*); § 7611, subds. (b) – (d).) "Although section 7611 makes no provision for a *Kelsey S.* father in its list of presumptions, a father asserting valid *Kelsey S.* rights may effectively qualify for presumed father status as the result of his constitutional right to parent, which overrides any contrary statutory direction." (*J.L., supra*, at p. 1023.)[5]

---

[3]  Because the juvenile court did not "lightly dissolve the relationship already established between [J.R.] and [M.T.]," it, sua sponte, granted J.R. " de facto parent status." The court continued an order granting J.R. unsupervised visits with M.T., and appointed counsel to represent J.R. in his de facto parent status.

[4]  No briefs have been filed by either the agency, counsel for mother, or counsel for the child.

[5]  In *Kelsey S.,* an adoption case, our Supreme Court held the statutes governing paternity decisions violate "the federal constitutional guarantees of equal protection and due process for unwed fathers *to the extent that* the statutes allow a mother unilaterally to preclude her child's biological father from becoming a presumed father and thereby allowing the state to terminate his parental rights on nothing more than a showing of the child's best interest." (*Kelsey S., supra*, 1 Cal.4th at p. 849.) "*Kelsey S.* was not a dependency action. But the vast majority of appellate courts to have considered the issue have had no difficulty extending its holding to dependency proceedings. [Citations.] [¶] In *Zacharia D*., although the Supreme Court stopped short of applying *Kelsey S.* in that dependency action, the court acknowledged that '[e]xtending *Kelsey S.* in the dependency context would allow such a father to participate as a "parent" in, or end the need for, the dependency proceedings.' ([*In re*] *Zacharia D.* [(1993)] 6 Cal.4th [435,] 451 [(*Zacharia D.*)].) . . . In keeping with . . . the weight of authority, we [conclude] *Kelsey S.* applies in the dependency context, affording such parents quasi-presumptive status, equivalent to

4

"Occasionally the complicated pattern of human relations gives rise to more than one legitimate claimant to presumed father status, and the juvenile court must resolve the competing claims." (*J.L., supra*, 159 Cal.App.4th at p. 1019.) Section 7612 sets forth the procedure for reconciling competing presumptions, stating, in pertinent part, that "[i]f two or more presumptions arise under Section . . . 7611 that conflict with each other . . . , the presumption which on the facts is founded on the weightier considerations of policy and logic controls." (*Id.*, at subd. (b).) "[I]n determining which presumption [was] . . . founded on weightier considerations of policy and logic," the juvenile court is "obliged to weigh all relevant factors" (*Jesusa V., supra*, 32 Cal.4th at pp. 637, 608), and "in the end protect the well-being of the child" (*Craig L. v. Sandy S.* (2004) 125 Cal.App.4th 36, 43).

On appeal J.R. presents no argument challenging the juvenile court's ruling declaring A.S. to have met the requirements of a presumed father based on his status as a *Kelsey S.* father. (*J.R. v. D.P.* (2012) 212 Cal.App.4th 374, 389; *In re Cheyenne B.* (2012) 203 Cal.App.4th 1361, 1378, fn. 22 (*Cheyenne B.*); *M.C., supra,* 195 Cal.App.4th at p. 222, fn. 13 (*M.C.*).) Rather, J.R. argues he also qualified as a presumed father, and challenges only some of the facts and criteria relied on by the juvenile court in determining which paternity presumption was founded on the weightier considerations of policy and logic pursuant to section 7612, subdivision (b). We conclude J.R.'s arguments do not require reversal.

The juvenile court's ruling is reviewed for an abuse of discretion. (*Jesusa V., supra*, 32 Cal.4th at p. 607.) We agree with J.R. that the sole test of abuse of discretion is not whether the juvenile court's action is "whimsical, arbitrary, or capricious." Nevertheless, as we have explained, " '[b]road deference must be shown to the [juvenile court] judge. The reviewing court should interfere only " 'if [it] finds that under all the evidence, viewed most favorably in support of the [juvenile] court's action, no judge could reasonably have made the order that he did.' . . ." ' [Citations.] . . . The juvenile court's opportunity to observe the witnesses and generally get 'the feel of the case'

presumed parent status under section 7611." (*In re M.C.* (2011) 195 Cal.App.4th 197, 219-220, fn. omitted (*M.C.*).)

5

warrants a high degree of appellate court deference." (*In re Jasmine D*. (2000) 78 Cal.App.4th 1339, 1351.)  Thus, to reverse the order under review, we would have to conclude the juvenile court's discretion could be exercised in only one way, compelling a finding in favor of J.R. as a matter of law.  We cannot so conclude in this case for the reasons we now discuss.

Contrary to J.R.'s contention, the record supports the juvenile court's finding that the family unit that deserved protection was that of mother, the child, and the child's half-sibling.  When the child was initially detained in late 2010, J.R. was no longer living with mother, the child, and the child's half-sibling.  By the time of the court hearings in late 2011, the child had been returned to the care of mother, who was in a residential program and receiving treatment for her chronic mental health issues.  The child's older half-sibling was then living with relatives and visiting with mother and the child.  Both children were attending the same school.  The relationship between mother and J.R. had ended and J.R. did not know if he would move back in with mother in the future.  Thus, we reject J.R.'s contention that the juvenile court applied too narrow a definition of "the family unit that deserved protection."

We also see no merit to J.R.'s contention that the juvenile court failed to consider the public policy of maintaining his existing parental relationship with the child.  The principal goal of our paternity statutes is to protect the child's well-being.  (*Kelsey S., supra,* 1 Cal.4th at p. 845; see *Jesusa V., supra*, 32 Cal.4th at pp. 607-608.) Consequently, in weighing the competing presumptions, the juvenile court here would have been remiss had it failed to consider the fact that J.R.'s relationship with the child had "damaging elements" due to J.R.'s "alcohol abuse and allegations of domestic violence."  (See Welf. & Inst. Code, § 300.2 ["a home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child"]; Fam. Code, § 3020, subd. (a) ["domestic violence in a household where a child resides is detrimental to the child"].) The court also properly considered that the absence of a parent-child relationship between A.S. and the child was not determinative as each time A.S. "had an opportunity to come

6

forward, take responsibility and establish a parental relationship with [the child], [A.S.] has demonstrated his commitment."[6]

Last, we see no merit to J.R.'s argument that the juvenile court improperly used the term "bond" in describing the developing relationship between A.S. and the child. In the agency's status review reports, the social worker assigned to the case reported that both the agency and A.S. were following the family therapist's suggestion that any relationship between A.S. and the child was to be pursued on a gradual basis to allow the child time to become comfortable with A.S. By July 18, 2011, A.S. was granted unsupervised visits with the child, with the first three or four visits to take place at the same time as the therapeutic visits, and if those visits went well then the visits would be entirely unsupervised. In the September 2011 report, the social worker reported the child had visited A.S. at least every two weeks in a therapeutically-supervised setting. There had also been a couple of weekend daytime visits that included the mother and A.S.'s family, an arrangement suggested by the family therapist so that the child could become better acquainted with A.S. Unsupervised visits were "moving gradually in order to allow the child time to gain comfort with" A.S., and it was recommended that A.S. have unsupervised daytime visits with the child at least every two weeks. The social worker opined the child was continuing to get to know A.S., and "[t]hus far, that relationship appears to be developing well." At the court hearings in late 2011, A.S. testified he was then seeing the child once every week for an hour and a half and the child had a sleepover at A.S.'s home once a month. Since March 2011, there had been five or six overnight visits; the first two were done before the issuance of a court order granting overnight visits but with the permission of mother and at the request of the child. A.S. described his activities with the child, who appeared to enjoy the time spent with A.S. and his family very much; the child never asked to go home and asked to stay longer. During the

---

[6]    Concededly, J.R.'s failure to elevate his status to that of M.T.'s presumed father deprived him of the *right* to reunification services. (*Zacharia D., supra,* 6 Cal.4th at p. 451.) However, he may still seek custody of M.T. "as a nonrelated extended family member under Welfare and Institutions Code, section 362.7." (*Cheyenne B., supra*, 203 Cal.App.4th at p. 1378, fn. 21.)

child's interview with the juvenile court, the child described the activities during the visits with A.S., and confirmed enjoying the visits and wanting to continue to see A.S. Thus, contrary to J.R.'s contention, we conclude no bonding study or conclusion of a social worker was necessary before the juvenile court could make an assessment and reasonably find A.S. and the child were developing a "bond" based on the nature of their visits and the child's response to those visits. No specific evidence was offered from which the juvenile court was required to find that the child had such a substantial, positive emotional attachment to J.R. such that the child would be greatly harmed if A.S. was declared to be the child's presumed father. [7]

## DISPOSITION

The December 9, 2011 order is affirmed.

_____

Jenkins, J.

We concur:

_____

Pollak, Acting P. J.

_____

Siggins, J.

_____

[7]    In light of our determination, we need not address the parties' other contentions. Also, A.S. has filed a motion, asking that we consider as additional evidence, or alternatively, take judicial notice of the following documents: (1) the agency's February 2012 status review report prepared for a scheduled hearing on March 22, 2012, (2) the agency's August 22, 2012 ex parte application seeking to change J.R.'s visits with the child from unsupervised to supervised, and (3) the juvenile court's order filed August 27, 2012, granting the agency's ex parte application and ordering that J.R.'s visits with the child were to be supervised by mother or a department-approved family member. Because these documents are not necessary to resolve this appeal, we deny A.S.'s motion as moot.

8