Filed 6/3/14  In re Danny M. CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re DANNY M., a Person Coming Under the Juvenile Court Law. | |
| CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU, Plaintiff and Respondent, v. DAVID M., Defendant and Appellant; KELLY R., Intervener and Respondent. | A138844 & A140256 (Contra Costa County Super. Ct. No. J12-01652) |

Presumptions and policies in determining parental status in dependency proceedings sometimes conflict, as they do here.  Dependent minor, Danny M., is now two years old.  Two men, David M. and Kelly R., seek recognition of presumed father status.  Kelly is Danny's biological father, and David was married to Danny's mother at all relevant times.  The trial court found both David and Kelly would qualify as a presumed father.  David asserted the "conclusive presumption" of paternity under Family Code section 7540,[1] as well as a presumption of presumed father status under section 7611, subdivision (a).  Weighing competing presumptions pursuant to section 7612, subdivision (b), the court declared Kelly the presumed father.  We affirm.

---

[1] All further undesignated statutory references are to the Family Code.

1

## I.    STATUTORY BACKGROUND

"The Uniform Parentage Act ( . . . § 7600 et seq.) . . . provides the statutory framework by which California courts make paternity determinations.  [Citations.]  Under this statutory scheme, California law distinguishes 'alleged,' 'biological,' and 'presumed' fathers.  [Citation.]  'A man who may be the father of a child, but whose biological paternity has not been established, or, in the alternative, has not achieved presumed father status, is an "alleged" father.  [Citation.]'  [Citation.]  'A biological or natural father is one whose biological paternity has been established, but who has not achieved presumed father status . . . .'  [Citation.] [¶] 'Presumed' fathers are accorded far greater parental rights than alleged or biological fathers.  [Citation.]  Presumed father status is governed by section 7611, which sets out several rebuttable presumptions under which a man may qualify for this status . . . .  [Citations.]  Biological fatherhood does not, in and of itself, qualify a man for presumed father status under section 7611.  On the contrary, presumed father status is based on the familial relationship between the man and the child, rather than any biological connection.  [Citation.]" (*In re J.L.* (2008) 159 Cal.App.4th 1010, 1018, fn. omitted.)

"[T]he need to establish a father's status in a dependency proceeding is pivotal; it determines the extent to which he may participate in the proceedings and the rights to which he is entitled.  [Citation.] [¶] . . . [¶] . . . '[O]nly a presumed . . . father is a "parent" entitled to receive reunification services under [Welfare and Institutions Code] section 361.5,' and custody of the child under Welfare and Institutions Code section 361.2.  [Citations.]" (*In re M.C.* (2011) 195 Cal.App.4th 197, 211–212.)

## II.    FACTUAL AND PROCEDURAL HISTORY

David and Danny's mother (Mother) have been married for approximately 20 years.  Before their marriage, Mother had a daughter, Brianna, with Kelly.  During her marriage with David, Mother had two children, Steven and Makenzie (the Siblings).  In 2010, David moved out of the family home and Kelly moved in with Mother.  About eight months later, Kelly moved out and David returned.  About nine months thereafter,

in January 2012, Mother gave birth to Danny. David's name is on Danny's birth certificate, and he brought Danny home and helped care for her.

*Dependency Petition and Detention*

In November 2012, David and Mother were living together with Danny and the Siblings. The family came to the attention of the Contra Costa County Children and Family Services Bureau (Agency) because the Siblings reportedly had chronic head lice and poor school attendance. Upon investigation, David blamed the head lice on the school and the poor attendance on Makenzie's oversleeping. He also said Mother's mental health was poor and she "stay[ed] locked in her room." During an unannounced home visit, a social worker found Mother crying and disheveled. Mother said she was depressed but able to care for Danny. Mother's adult daughter, Brianna, told the Agency that she would get the Siblings to school when she lived with the family (she moved out in October 2012) because Mother and David "did not feel like getting up." Brianna said the house was filthy, Mother and David used drugs, David drank, and there was "something wrong with [Mother]. [She] has lost her hair and she sees things. . . . [David] won't take [M]other to the doctors."

On November 26, 2012, Kelly called the social worker to report that he was Danny's biological father. David also told the social worker that Kelly was Danny's biological father, but David said he treated Danny as his own child.

During a November 27, 2012 home visit, David said a prior 2010 domestic violence incident occurred because he was addicted to prescription pain medication.[2] He assaulted Mother during a breakdown and he did not remember the incident. Mother said the incident occurred because she got angry and threw his pills on the floor. They both denied current domestic violence. David said he suffered from depression and took Prozac and Trazadone, in addition to the Vicodin he continued to take for pain. Mother

---

[2] In September 2010, David "beat" Mother "black and blue." She crawled out of their trailer home and a neighbor called the police. Mother obtained a three-year restraining order against David. Apparently, no juvenile dependency investigation occurred as a result of that incident, which occurred outside the presence of the children.

3

said she was diagnosed with a bipolar disorder a few years previously and prescribed Paxil and Depakote, but had not taken medication for about five years. She denied substance abuse. During the visit, David grabbed Steven tightly by the arm when Steven asked for help, causing Steven to yelp. The social worker summarized the visit as follows: "[David] monopolized the conversation. Although he answered the questions he did not appear authentic. He was very harsh with Steven. . . . [David] clearly did not want to leave [M]other alone with [the] social worker. There was tension between them. [David] glared at [M]other." In subsequent interviews, Steven told the social worker that David yelled and grabbed him if he got in trouble, that he tried to protect Mother and Danny from David's anger, and that Mother saw bugs that no one else saw. Makenzie told the social worker that David was " 'a little bit mean to her and Steven,' " and she would hold the baby when David and Mother argued. Brianna told the Agency that David " 'treats the kids bad and he's beating on [Mother],' " and Mother's mother reported that David was "mean" and violent toward Mother, and Mother was "scared to death of him." Also, during a recent incident Makenzie said she was scared and David told her, " 'bite my left nut.' "

On November 29, 2012, the Agency learned that an ambulance had taken David away from the family home the previous night. Upon investigation, Mother reported that she had told David she was going to leave him because she did not want to lose her children and she thought the social worker did not believe what David said during the home visit. Mother and David argued, and Mother said she would call the police. David said if she called the police he would " 'bury [her] kids so far in the foster care system that [she would] never see them.' " David then called the police and took two large handfuls of medication after he had been drinking. The police arrived and David "pretended that he was not breathing so one of the officers pinched him. He jumped up and began yelling obscenities." Mother told an officer she was being abused by David, and David was taken away by ambulance. Mother said that about a week prior to this incident David had punched her in the hip and kicked her bare toes with a boot in the presence of the children. She tried to call the police but David pulled the phone wires out

4

of the wall. Mother agreed to immediately move herself and the children to her father's house. She also agreed to enforce the restraining order against David.

On December 7, 2012, the Agency filed juvenile dependency petitions on behalf of the three children pursuant to Welfare and Institutions Code section 300, subdivision (b). Danny's petition identified David as Danny's presumed father. As grounds for jurisdiction, the petition alleged that Mother had untreated bipolar disorder and anxiety attacks that affected her ability to adequately parent Danny; Mother maintained a relationship with David despite suffering domestic violence from him and obtaining a protective order; David was convicted of domestic violence in 2010 for punching Mother three times in the head and face and twice in the abdomen; David hit Mother with his fist and kicked her with a boot in front of Danny on or about November 20, 2012; David was arrested three times in 2012 for violating a protective order; David had substance abuse and mental health problems that affected his ability to adequately parent Danny; David was intoxicated when he was arrested for violating a protective order in October 2012; and David took about 120 prescription pills and drank alcohol on or about November 29, 2012 in a suicide attempt while Danny was in the home. Petitions filed on behalf of the Siblings were similar in content.

The Agency recommended that the children be placed with Mother in her father's home and detained from David. At the December 10, 2012 detention hearing, the court commented that Mother looked "spaced-out" and ordered her drug tested. She tested positive for methamphetamine. The court then detained the children from Mother, David and Kelly (who appeared at the hearing), and placed them with the maternal grandparents. The children were later moved to a foster home.

*Paternity Proceedings*

At the December 10, 2012 hearing, Kelly was present with counsel. He requested a paternity test and submitted a statement regarding parentage. The court ordered the paternity test and granted Kelly supervised visitation. Minor's counsel and Mother's counsel suggested that Kelly used drugs and the court ordered him drug tested. Kelly tested positive for THC, but the court did not change its orders.

5

At a February 7, 2013 hearing, counsel announced that testing had confirmed Kelly's biological paternity. Both Kelly and David asked to be recognized as Danny's presumed father. The court scheduled a hearing on presumed father status, and granted David supervised visitation with Danny.

At the paternity hearings (Feb. 14, Mar. 15, Apr. 9, 2013), Kelly testified that he and Mother had been romantically involved in the late 1980's, when they conceived Brianna. In September 2010,[3] while Mother and David were separated, Mother and Kelly reunited for about eight months and lived together with the Siblings. They agreed to have another child together, and they had unprotected sex knowing they could conceive. They were also using methamphetamine, "more than we should have." Kelly testified that Mother initiated the use when they lived together and that he stopped using as soon as he moved out. He often purchased the drugs that they used. It concerned him that Mother was using the drug while she was trying to get pregnant, and "I did ask her several times to . . . at least cut back, if not quit," which might have contributed to their breakup. When he learned about Danny, he was concerned about the effect of methamphetamine on her, but felt reassured when Danny seemed healthy and alert.

Mother and Kelly separated in April 2011. Kelly did not follow up with Mother about any possible pregnancy because she had told him not to contact her; because they had had unprotected sex over an extended period and she had not become pregnant, so he thought it unlikely that she would become pregnant; and because he assumed she would

---

[3] Kelly clearly confused dates in his testimony. He testified he was involved with Mother from September 2011 to April 2012, but Danny was born in January 2012. Kelly testified that he learned about Danny in October 2012. However, he also testified that he learned about Danny eight months after she was born, which would be in September; that Mother and David first brought Danny for a visit a few weeks later, which would be November 2012; and that Danny came for an overnight visit six to eight weeks thereafter, which would be in December 2012 or January 2013. Because the petition was filed in early December, Kelly's chronology seems to be off by a couple of months, which would be consistent with his prior statement to a social worker that he first learned about Danny in August 2012, as well as his later testimony that the overnight visit occurred in November 2012.

contact him if she had become pregnant, as she always had his number and knew how to reach him. In August 2012, Mother called to tell him he had a child with her, Danny. This was the first time they had spoken since their breakup, and it was the first Kelly knew of the pregnancy or the child.

Within a couple of weeks, Mother and David brought Danny over to Kelly's house for a two- to three-hour visit. The resemblance between Kelly and Danny was "very apparent," and Kelly had no doubt that Danny was conceived while he and Mother were living together. David did not react negatively to Kelly. "[I]t was all very calm and collective [*sic*]" among the three of them. Kelly asked to visit Danny again, but it took several weeks and phone calls to arrange another visit because of "sicknesses and other issues." In about November 2012, Danny had an overnight visit with Kelly and his parents, who lived together. Kelly cared for her during the overnight visit, feeding her, bathing her, changing her diaper and putting her to sleep. Kelly requested additional visits, but the dependency case started and he was not able to see her. When asked if he ever requested a regular visitation schedule with Danny, Kelly replied, "[H]onestly, this all happened so fast, it wasn't able to be boiled down to a regular visitation at that point." Kelly offered money to help support Danny but "they had told me that they were fine. We never had settled on a—you know, what can I give to help. [¶] . . . [¶] . . . I told them that I would be more than willing to help."

Kelly learned about the dependency case from Brianna and the maternal grandmother, who told him he needed to "seek out [his] potential relationship with Danny . . . ." He called the social worker on November 26, 2012, and he appeared at the detention hearing on December 10. He also sent "a couple of checks" for $50 and $75 to Danny when she was living with the maternal grandmother during the dependency case. As of March 15, 2013, Kelly had attended three supervised visits with Danny. At the visits, he fed her, played with her, and changed her diaper.

David testified that he moved out of Mother's home on "September 31 [*sic*], 2010," and moved back in April or May 2011. About a month after his return, in about June 2011, Mother discovered she was pregnant. He thought the child was his, but knew

7

there was a "slim chance" that the child could be Kelly's. He prepared for Danny's birth, signed the birth certificate, attempted to tell a friend he was having a new baby (the text did not go through), took Danny into the home after her birth, and provided for her financially. Danny lived with Mother and David, and David helped feed, change, bathe, and hold Danny, and he rocked her to sleep. She called him "Daddy" or "Da Da." When he took her for walks, he told people she was his daughter. He took her to doctor appointments. He also knew what toys and activities she liked.

At first, neither Mother nor David tried to contact Kelly about Mother's pregnancy, even though they knew the baby might be Kelly's. About six months after Danny was born, she started to resemble Kelly, so David and Mother decided to contact Kelly because he had a right to know he had a daughter. David wanted to integrate Kelly into Danny's life and let him become a father to her. Kelly's first visit with Danny was delayed because Danny was sick, but then David and Mother drove Danny out to see Kelly for a few hours. About two months later, Danny had an overnight visit with Kelly. David still wanted Kelly to be a part of Danny's life, but he also wanted to raise Danny as his own child. He was willing to be financially responsible for Danny for the rest of her life.

Mother made an offer of proof that she would testify that David, rather than Kelly, has been playing the primary role of caregiver for Danny and he provided all financial support and day-to-day assistance with respect to Danny.

*Paternity Disposition*

Kelly and minor's counsel for Danny urged the court to grant Kelly presumed father status. The Agency, David, Mother, and minor's counsel for the Siblings urged the court to grant David presumed father status.

The court denied presumed father status to David and granted presumed father status to Kelly, with these comments: "I found [Kelly] quite a compelling and credible witness on the stand. He was very forthright and frank, acknowledging the substance abuse issues. His description of his relationship with [Mother] I found compelling and genuine; also, the fact that this was not a one-time fling that resulted in the birth of a

8

child.  This was a rekindling of a long-time relationship in hopes of producing a child. And when he was given the information that this relationship did indeed produce a child, he immediately stepped forward. [¶] First, he wanted to make sure it was his.  But when he laid eyes on the child—and there's no dispute in any of the testimony that Danny looks like [Kelly].  And [Kelly] and [David] certainly look different.  And since that time, he has made, I believe, based on the evidence before me, significant steps to involve himself in Danny's life. [¶] I did not find [David]'s testimony, quite frankly, as credible. I found much of his testimony to be somewhat embellished. . . . He did not, in the Court's view, seem as credible or genuine, quite frankly, in his discussion of Danny and his relationship with her, as [Kelly] did. [¶] Furthermore, I agree with [Danny's counsel]'s comments that, interesting enough, it was [David] who quite frankly is in control of everything that seems to happen in the household, and did initiate inviting [Kelly] in, and is the one who encouraged this disclosure. [¶] And I don't believe that the Court can support a policy where two parents could conceal the fact that [Kelly] has a child from him, and then come into Court and try to deny [Kelly] what I believe to be his right to participate fully as a father in Danny's life.  This is not a matter of simple biology.  He came forward.  He was here on the first day of these petitions, and he did nothing quite frankly to bring this family to Court.  And yet he showed up.  He stepped up.  He's admitted his issues. [¶] . . . [Kelly] testified that he was giving [Mother] space because of the nature and the volatility of the relationship involved to figure out who she wanted— who does she want to be with in terms of lifetime partnership.  And he backed off.  And I found that testimony very persuasive. . . . [¶] So, for those reasons, I believe it's in the best interest of Danny, and I think it supports all the right policy decisions, to deny [David]'s request to be raised to the status of presumed.  I am raising [Kelly] to the presumed status for Danny."

### *Dependency Jurisdiction and Disposition*

At the May 3, 2013 jurisdiction hearing, Danny's petition was amended to strike all allegations regarding David, and to allege as to Mother that she had engaged in domestic violence in the child's presence, and that she had untreated mental health and

9

substance abuse problems that affected her ability to care for and adequately parent the child. The specific factual allegations were stricken. No allegations were made against Kelly. Mother pled no contest to the petition as amended. The Siblings' petitions were amended and both Mother and David pled no contest to those petitions. The court declared Danny and the Siblings dependents.

In a disposition report, the Agency wrote that Mother had completed 60 days of inpatient substance abuse treatment and received a 30-day extension to give her time to locate suitable housing. She had regularly tested negative for drugs, she had completed a psychological assessment, she had met with a psychiatrist three times, and she was meeting weekly with a therapist. She was also scheduled to attend a domestic violence support group and intensive couple's therapy with David. Her plan was to "remove the restraining order against [David] so they can re-build more healthy relations by participating in therapy together." David had completed anger management and parenting classes, and he had regularly tested negative for drugs. He was taking his prescribed medications and attending weekly therapy and monthly visits with a psychiatrist, and he had agreed to enter couple's therapy with Mother. The Agency initially was concerned about Mother's plan to reunite with David, but "due to there being no prior [dependency] history, being married almost twenty years and that it appeared the problems in the marriage arose from their substance abuse, the [Agency] has reconsidered . . . . [T]hey both are clean and sober as well as in treatment for their mental health symptoms . . . ." Kelly had just agreed to participate in services. He had tested negative for drugs twice, was starting 12-step program meetings and parenting classes.

The Agency wrote that "all three parents have made significant efforts to take responsibility for their actions and seek help. Furthermore, they have confronted mistakes and prioritized their lives around working with the court, getting treatment and providing a health home to the children. Lastly, each parent has visited consistently with each child and has cooperated with the [Agency] . . . ." All three children had been placed in a temporary foster home. Danny was doing well. The Agency recommended

six months of reunification services for Mother and David for the Siblings, and for Mother and Kelly for Danny.

At the May 2013 disposition hearing, the court approved the case plans for all three parents and scheduled a six-month review hearing for November 7. David objected to the fact that money was still being taken from his Social Security check to pay for services and child support for Danny, despite the court's ruling on presumed father status. The court found that David was no longer responsible for those expenses. David appealed from the disposition order, challenging the denial of presumed father status as to Danny.[4] David filed his opening brief on September 5, 2013.[5] On November 18, 2013, the court received a letter from the Agency advising that it would not oppose David's appeal and it had so advised Kelly's counsel.

*Six-Month Status Review*

In the meantime, the Agency filed a six-month status review report. In late June 2013, Mother had tested positive for marijuana after a weekend leave and had to move out of the treatment center. She moved in with her father. Mutual discord developed, police were called, and Mother moved into a homeless shelter with David. In August, they moved into a three-bedroom home with the help of a social services agency. During the period of housing instability, Mother and David faltered on services and the Agency required that their visits be supervised. Later, Mother and David came into compliance with their case plans once again. Kelly also participated in services, and Danny was doing well.

---

[4] David also argued the court failed to comply with the Indian Child Welfare Act because it never inquired whether David had Indian heritage. The Agency has asked us to take judicial notice of forms filed in the juvenile court in November 2013, including a form in which David averred that he had no known Indian ancestry. We deferred ruling on the request until we addressed the merits of the appeal. We now deny the request as unnecessary. The relevant document is in the record of the consolidated appeal. We agree that this evidence demonstrates that any initial error in the court's Indian Child Welfare Act inquiry was nonprejudicial. David concedes the issue is "moot."

[5] Appeal No. A138844.

11

The Agency recommended continuing the Siblings in foster care with reunification services for Mother and David, and placement of Danny with Kelly with family maintenance services. At a November 7, 2013 hearing, the court adopted the Agency's recommendations over David's continuing objection to the denial of presumed father status as to Danny.

David appealed the six-month review order, citing "FM w/ [Kelly]; . . . no visits w/ Danny + [David]."[6] In January 2014, the First District Appellate Project asked the court to appoint counsel for Kelly to oppose both of David's appeals. We granted the request, and in February we consolidated the appeals. Kelly filed his respondent's brief in the consolidated appeals on April 4 and David filed his reply on April 24. On April 11, David petitioned for a writ of supersedeas to stay a status review hearing scheduled for April 21, at which the juvenile court might terminate dependency jurisdiction over Danny. We granted the petition and stayed trial court proceedings in Danny's case until resolution of the consolidated appeals.

### III.    DISCUSSION

A.    *Presumed Father Status and Standard of Review*

Section 7540 provides a "conclusive presumption" of paternity if a child is conceived while a married couple is living together: "Except as provided in Section 7541, the child of a wife cohabiting with her husband, who is not impotent or sterile, is conclusively presumed to be a child of the marriage." Under section 7541, the husband, the child, a presumed father seeking to establish paternity, or the mother in certain circumstances may move for court-ordered blood testing to determine biological paternity. (§ 7541, subds. (b), (c).) If the tests show "that the husband is not the father of the child, the question of paternity of the husband shall be resolved accordingly." (§ 7541, subd. (a).)

Where section 7540 does not apply, the Uniform Parentage Act governs presumed father status. "Section 7611 sets forth several rebuttable presumptions under which a

---

[6] Appeal No. A140256.

12

man may qualify as a presumed father, two of which are pertinent here. They are: if the man is or has been married to the child's mother and the child is born during (or soon after) the marriage (§ 7611, subd. (a)), or the man 'receives the child into his home and openly holds out the child as his natural child.' (§ 7611, subd. (d).) . . . [¶] An alleged father has the burden to establish, by a preponderance of the evidence, the foundational facts supporting his entitlement to presumed father status . . . . [Citation.] If the alleged father establishes this foundation and it is challenged, the statutory presumption may be rebutted in an appropriate action only by clear and convincing evidence. (§ 7612, subd. (a); [citations].) [¶] An unwed father may also, under narrow circumstances, assert constitutional paternity rights, even though he does not qualify under a statutory presumption under section 7611. ([*Adoption of Kelsey S.* (1992)] 1 Cal.4th [816,] 849 [(*Kelsey S.*)]; [citations].) Such a . . . '*Kelsey S.*' father . . . is an unwed biological father who comes forward at the first opportunity to assert his paternal rights after learning of his child's existence, but has been prevented from becoming a statutorily presumed father under 7611 by the unilateral conduct of the child's mother or a third party's interference. (*In re Elijah V.* (2005) 127 Cal.App.4th 576, 583 . . . .)" (*In re M.C., supra,* 195 Cal.App.4th at pp. 212–213.)

Under the statutory scheme in place at the time of the paternity disposition in issue here, the juvenile court was required to choose one presumed father over the other: "Although more than one individual may fulfill the statutory criteria that give rise to a presumption of paternity, 'there can be only one presumed father.' [Citations.]" (*In re Jesusa V.* (2004) 32 Cal.4th 588, 603 (*Jesusa V.*).) "If two or more presumptions arise under Section . . . 7611 that conflict with each other, . . . the presumption which on the facts is founded on the weightier considerations of policy and logic controls." (§ 7612, subd. (b).)[7]

_____

[7] Effective January 1, 2014, section 7612 was amended to provide, "In an appropriate action, a court may find that more than two persons with a claim to parentage under this division are parents if the court finds that recognizing only two parents would be detrimental to the child. In determining detriment to the child, the court shall consider

13

"We review a juvenile court's determination of presumed parentage status under the substantial evidence standard. [Citations.] '[W]e review the facts most favorably to the judgment, drawing all reasonable inferences and resolving all conflicts in favor of the order. [Citation.] We do not reweigh the evidence but instead examine the whole record to determine whether a reasonable trier of fact could have found for the respondent. [Citation.]' [Citation.]" (*In re M.C., supra,* 195 Cal.App.4th at p. 213.) We review a juvenile court decision resolving conflicting claims to presumed father status under section 7612, subdivision (b) for abuse of discretion. (*Jesusa V., supra,* 32 Cal.4th at p. 607.)

B.     *The Section 7540 Conclusive Presumption Does Not Apply to David.*

As noted *ante*, "the child of a wife cohabitating with her husband, who is not impotent or sterile, is conclusively presumed to be a child of the marriage." (§ 7540.) The parties agree that "the words 'wife cohabitating with her husband' have been judicially construed to mean cohabitating at the time of *conception*, not cohabitating at the time of *birth*." (*Brian C. v. Ginger K.* (2000) 77 Cal.App.4th 1198, 1203; *Dawn D. v. Superior Court* (1998) 17 Cal.4th 932, 937, fn. 4 (*Dawn D.*).) The trial court made no express finding on David's claim to presumed father status under section 7540. We infer

_____

all relevant factors, including, but not limited to, the harm of removing the child from a stable placement with a parent who has fulfilled the child's physical needs and the child's psychological needs for care and affection, and who has assumed that role for a substantial period of time. A finding of detriment to the child does not require a finding of unfitness of any of the parents or persons with a claim to parentage." (§ 7612, subd. (c); see also § 7601, subds. (b), (c) [definition of "parent and child relationship" "does not preclude a finding that a child has a parent and child relationship with more than two parents"].) This new subdivision of section 7612 was enacted as part of Senate Bill No. 274, which was expressly designed "to abrogate *In re M.C.*[, *supra,*] 195 Cal.App.4th 197 insofar as it held that where there are more than two people who have a claim to parentage under the Uniform Parentage Act, courts are prohibited from recognizing more than two of these people as he parents of a child, regardless of the circumstances." (Stats. 2013, ch. 564, § 1, subd. (b) [legislative findings and declarations].)

14

the court found David did not satisfy the statute's requirements, and hold the finding is supported by substantial evidence.

David argues that "[s]ubstantial evidence showed that [he] and [Mother] were cohabitating at the time of [Danny's] conception." The question before us, however, is whether there is substantial evidence to support the trial court's implied finding that David and Mother were *not* cohabitating at the time of Danny's conception. (It was undisputed David and Mother were married when Danny was conceived.) Kelly testified he moved out of Mother's home in April 2011. David testified he moved back in with Mother in April or May 2011. It can be inferred that Danny was conceived in mid-April 2011, nine months before her birth in mid-January 2012.[8] Genetic testing proved Kelly was Danny's biological father. There was no evidence that Kelly and Mother had sexual relations after Kelly moved out. Moreover, Kelly expressly testified that he was sure Danny was conceived while he was living with Mother. We conclude substantial evidence supports the trial court's implied finding evidence that Danny was conceived while Mother was still living with Kelly.

David argues that, had the trial court followed proper procedures at the detention hearing, the court would have found he qualified for section 7540 presumed father status. Welfare and Institutions Code section 316.2 requires the court to inquire about, and record its findings on, the identity of all presumed or alleged fathers at the detention hearing and the mother's marital status at the time the child was conceived and thereafter. (Welf. & Inst. Code, § 316.2, subds. (a)(2), (a)(3), (f); see also Cal. Rules of Court, rule 5.635.) David claims that if the court had conducted this inquiry, it would have determined at the detention hearing that David was the conclusively presumed father under section 7540 and then could not have later found Kelly to be a presumed father under section 7611 or *Kelsey S.* Because Kelly was only an alleged father, David argues,

_____

[8] David cites authority that "the average period of gestation is between 270 and 282 days. (*Whitney v. Whitney* (1959) 169 Cal.App.2d 209, 214.)" (*In re Elijah V., supra,* 127 Cal.App.4th at p. 587.) This average gestational period does not alter an inference of a mid-April 2011 conception.

15

he would not have had standing to request genetic testing to rebut the section 7540 conclusive presumption and the court would have had to declare David the presumed father with no further proceedings. (See *In re Elijah V., supra,* 127 Cal.App.4th at pp. 585–586 & fn. 3 [alleged father has no right under § 7541 or § 7551 to paternity test to rebut conclusive presumption of § 7540].)

This argument fails for several reasons. First, the court inquired about fathers at the detention hearing. Some of the information was volunteered by counsel prior to the court's inquiry, and the court then asked appropriate follow-up questions. Second, statements made at the detention hearing did not clearly indicate that David was the conclusively presumed father under section 7540. Kelly was present and his attorney told the court, "[T]here was a period of time . . . when [M]other left [David] and went back together with [Kelly]. And we believe it was during that period of time that Danny was conceived." Mother was present and did not dispute his account. The court thus had evidence before it that Mother and David were not *cohabiting* at the time of Danny's conception and no basis to conclude that section 7540 necessarily applied. Where section 7540 does not apply, California Rules of Court, rule 5.635(h) *requires* the juvenile court to determine biological paternity and presumed fatherhood on the request of a person who appears at a dependency hearing.[9] (See *In re Vincent M.* (2008) 161 Cal.App.4th 943, 959.) Third, even if section 7540 applied, Kelly was a presumed father for reasons stated *post*, and thus had standing to ask for genetic testing under section 7541. The court did not err by ordering genetic testing at the detention hearing and by holding the paternity hearings.

C.     *Kelly Has Standing to Challenge David's Section 7611 Presumed Father Status.*

It is undisputed that David qualified as a presumed father under section 7611, subdivision (a) (hereafter section 7611(a)) because David and Mother were married at the

_____

[9] Rule 5.635(h) of the California Rules of Court does not by its terms exclude cases where another person has established the conclusive presumption of section 7540. We assume the rule does not apply in such a case, but we need not and do not resolve that question here.

time of Danny's birth. David argues Kelly lacks standing under section 7630 to challenge David's 7611(a) presumed father status. Section 7630 governs standing to "bring an action" to declare the existence or nonexistence of parent-child relationships in varying circumstances. David relies on *Dawn D., supra,* 17 Cal.4th 932, and two Court of Appeal cases, *Lisa I. v. Superior Court* (2005) 133 Cal.App.4th 605, and *Neil S. v. Mary L.* (2011) 199 Cal.App.4th 240. These cases are no longer good authority to the extent that they rely upon section 7630 because material amendments to the statute became effective prior to the commencement of this dependency case.

At the time *Dawn D.* was decided, former section 7630, subdivision (a) (former section 7630(a)) provided that "[a] child, the child's natural mother, or a man presumed to be the child's father under subdivision (a), (b), or (c) of Section 7611" could bring an action "[f]or the purpose of declaring the nonexistence of the father and child relationship presumed under subdivision (a), (b), or (c) of Section 7611 . . . ." (*Dawn D., supra,* 17 Cal.4th at p. 935, fn. 2.) The appellant, an alleged *Kelsey S.* father, had no standing under this subdivision to challenge another man's section 7611(a) presumed father's status. Nor did any other provision of former section 7630 confer standing on the appellant. (*Dawn D.,* at pp. 937–938 & fn. 5.) As applied to a biological father with no existing relationship with the child, section 7630's denial of standing was not unconstitutional. (*Dawn D.*, at pp. 943–944; see also *Lisa I. v. Superior Court, supra,* 133 Cal.App.4th at pp. 616, 618–620 [same even though husband divorced the mother]; *Neil S. v. Mary L., supra,* 199 Cal.App.4th at pp. 252–253 [same even though appellant cared for mother during pregnancy and was obstructed from establishing relationship with twins after birth].)

Effective January 1, 2011,[10] before this dependency case commenced, the Legislature amended section 7630 to provide that, except where the conclusive

---

[10] David notes that *Neil S. v. Mary L.* was decided in 2011 after the amendment to section 7630 went into effect. However, the paternity action under review in that case was filed in 2010 before the amendment went in effect and the court gives no indication

17

presumption of section 7540 applies, "a man alleged or alleging himself to be the father" had standing to bring an action "to determine the existence of the father and child relationship." (§ 7630, subd. (c), as amended by Stats. 2010, ch. 588, § 1.) Formerly, section 7630, subdivision (c) had been restricted to cases where there was no living presumed father. The Legislature also repealed former section 7631, which had allowed alleged fathers to bring a paternity action if the mother had relinquished the child for adoption. (Stats. 2010, ch. 588, § 2.) Section 7630, subdivision (a) was not changed. (Stats. 2010, ch. 588, § 1.)

Division Three of this court recently held that section 7630, as amended in 2010, unambiguously allows an alleged father "to bring an action to determine the existence of the father and child relationship, regardless of whether another man is also a presumed father of the same child." (*V.S. v. M.L.* (2013) 222 Cal.App.4th 730, 736.) The appellant, who was the biological father, sought to establish his presumed father status under *Kelsey S.*, and the mother's then-husband had section 7611(a) presumed father status. (*V.S. v. M.L.,* at p. 733.) At the time, there could only be one presumed father. (*Jesusa V., supra,* 32 Cal.4th at p. 603.) Division Three acknowledged the wording of section 7630, subdivision (a) remained unchanged,[11] but held the statute was nevertheless clear: "While there may be some redundancy in subdivisions (a), (b), and (c) of section 7630, there is no conflict between those provisions, at least with respect to any issue in the present case." (*V.S. v. M.L.,* at p. 736 & fn. 7.) Nor did the legislative history

that the subsequent amendment was brought to its attention. (*Neil S. v. Mary L., supra,* 199 Cal.App.4th at pp. 245, 251.)

[11] Section 7630, subdivision (a) was subsequently amended. That section previously provided that an action to determine parentage under that section could be brought by "[a] child, the child's *natural mother*, or a man presumed to be the child's father under subdivision (a), (b), or (c) of Section 7611 . . . ." (Stats. 2010, ch. 588, § 1, italics added.) The current statute provides that such an action may be brought by "[a] child, the child's *natural parent*, a person presumed to be the child's parent under subdivision (a), (b), or (c) of Section 7611 . . . ." (Stats. 2013, ch. 510, § 8.) A "natural parent" is "a nonadoptive parent established under this part, whether biologically related to the child or not." (§ 7601, subd. (a).)

18

of the amendment undermine the court's confidence in its interpretation. (*Id.* at pp. 735–736 & fn. 6.) We see no reason to disagree with this analysis.

David does not cite, and we do not find, a dependency case in which a putative father was denied standing to seek presumed father status based on section 7630.[12] Under section 7630, as amended in 2010, Kelly had standing to seek presumed father status in this dependency case. We reject David's argument to the contrary.

D.   *Substantial Evidence Supports Kelly's Presumed Father Status.*

It is not entirely clear from the trial court's ruling whether the court found Kelly a presumed father under section 7611, subdivision (d) (hereafter section 7611(d)) or under *Kelsey S.* David argues there was no substantial evidence to support the finding on either basis. We disagree.

Kelly literally satisfied section 7611(d)'s requirements at the start of the dependency action because he had received Danny into his home for two visits, including an overnight visit, and inferably held Danny out to his parents (who lived with him) as his natural child. However, the bare statutory requirements have been given more substantive meaning by the courts. To qualify under section 7611(d), receipt into the home must be substantial enough to signify assumption of parental responsibility for the

---

[12] It is not entirely clear how section 7630 is to be applied in dependency cases. "There are two ways the juvenile court may proceed to determine the identity of a child's presumed father if no prior determination has been made. Under Welfare and Institutions Code section 316.2, subdivision (d) and Family Code section 7630 . . . [or] [a]lternatively, the juvenile court itself 'may make such a determination' even if no action is filed under Family Code section 7630. [Citation]." (*Jesusa V., supra,* 32 Cal.4th at p. 620, citing Cal. Rules of Court, former rule 1413(e); see Cal. Rules of Court, rule 5.635.) Welfare and Institutions Code, section 316.2, subdivision (d) provides that "[i]f a man appears in the dependency action and files an action under section 7630 . . . of the Family Code, the court shall determine if he is the father." (See Welf. & Inst. Code, § 316.2, subd. (e) [granting dependency court exclusive jurisdiction over Fam. Code, § 7630 action]; cf. Welf. & Inst. Code, § 316.2, subds. (a), (b), (f) [in dependency case, court has duty in any event to inquire "as to the identity and address of all presumed or alleged fathers," provide notice, and make findings].) Assuming section 7630 is applicable in a dependency case like this one, the statute in its then-current form did not bar Kelly's challenge to David's presumed father status.

19

child.  (See *Charisma R. v. Kristina S.* (2009) 175 Cal.App.4th 361, 374 ["receipt of the child into the home must be sufficiently unambiguous as to constitute a clear declaration regarding the nature of the relationship, but it need not continue for any specific duration"], overruled on other grounds in *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 532, fn. 7.)  We doubt that Kelly's two visits with Danny were alone sufficient to satisfy this standard.  (Cf. *In re Kiana C.* (2001) 93 Cal.App.4th 1109, 1112, 1116–1117 [father who had always been part of child's life, who lived with mother and child off and on since the child was four, and who took the child into his home for months at a time had sufficiently received child into home to qualify for § 7611(d) status].)

There was, however, substantial evidence that Kelly was a *Kelsey S.* father.  In the dependency context, a *Kelsey S.* father is "a biological father who is precluded from attaining presumed father status by the mother or a third party, but who comes forward early in the dependency process, and who displays" a " 'full commitment to his parental responsibilities—emotional, financial, and otherwise.' "  (*In re Zacharia D.* (1993) 6 Cal.4th 435, 450–451.)[13]  The trial court expressly found that when Kelly learned about Danny, "he immediately stepped forward. [¶] First, he wanted to make sure it was his.

---

[13] Citing *Dawn D., supra,* 17 Cal.4th 932 and *Rodney F. v. Karen M.* (1998) 61 Cal.App.4th 233, David argues the *Kelsey S.* analysis does not apply where the child is born into a marriage.  He is incorrect.  The cited cases do not limit *Kelsey S.* to cases of unwed mothers, nor did the courts hold that the biological fathers in those cases failed to satisfy the *Kelsey S.* criteria.  Rather, the courts held that *statutory* bars to the biological fathers' obtaining presumed father status (former section 7630(a) and section 7540, respectively) were not unconstitutional regardless of whether the biological fathers satisfied the *Kelsey S.* criteria.  (*Dawn D.*, at p. 942; *Rodney F. v. Karen M.*, at pp. 239–240.)  We have already explained *ante* that section 7540 does not apply here, and that section 7630 as amended no longer denies a *Kelsey S.* father standing to challenge another man's presumed father status under section 7611, subdivisions (a), (b) or (c).  Therefore, *Dawn D.* and *Rodney F. v. Karen M.* do not undermine the trial court's finding that Kelly satisfied the *Kelsey S.* criteria.  Other courts have granted presumed father status to a biological *Kelsey S.* father despite the mother's marriage to another man.  (See *Michael M. v. Giovanna F.* (1992) 5 Cal.App.4th 1272, 1282–1285; *Brian C. v. Ginger K., supra,* 77 Cal.App.4th at p. 1217; *Gabriel P. v. Suedi D.* (2006) 141 Cal.App.4th 850, 859–860.)

But when he laid eyes on the child—and there's no dispute in any of the testimony that Danny looks like [Kelly]. And [Kelly] and [David] certainly look different. . . . [S]ince that time, he has made, I believe, based on the evidence before me, significant steps to involve himself in Danny's life." The court found "compelling and genuine" Kelly's testimony that he had taken his relationship with Mother seriously and had hoped to have a child with her. Kelly testified that he did not follow up with Mother after their breakup to learn if she had become pregnant because she had asked him not to contact her; she knew how to contact him and he believed she would if she knew she was pregnant with his child (which ultimately proved to be true); and he doubted she had become pregnant because they had had unprotected sex for months without conceiving. These are reasonable explanations and the court found his testimony credible. Moreover, the court expressly found that Mother and David "conceal[ed] the fact that [Kelly] has a child from him." Kelly testified that once he learned about Danny he actively tried to play a substantial role in Danny's life—by offering money and seeking additional visits—but was, inferably, stymied by Mother's refusal or failure to respond to his phone calls. Although David testified to the contrary, the court found Kelly's testimony credible and David's not. When the dependency case started, the court found, Kelly "came forward. He was here on the first day of these petitions, [even though] he did nothing quite frankly to bring this family to Court. And yet he showed up. He stepped up."

On these findings, which are supported by substantial evidence, the court could properly find Kelly to be a *Kelsey S.* father.

E.      *The Court Did Not Abuse Its Discretion in Declaring Kelly the Presumed Father.*

Both David and Kelly qualified as presumed fathers. Under the statutory scheme then in place, the court had to weigh the competing presumptions and choose a sole presumed father. The court was required to "weigh all relevant factors," and no single factor—whether social or biological—controls resolution of the conflict between competing fathers. (*Jesusa V., supra,* 32 Cal.4th at p. 608.) The court had to determine which presumption was "founded on the weightier considerations of policy and logic."

21

(*Ibid.*; § 7612, subd. (b).) We hold that the court did not abuse its discretion in choosing Kelly as the sole presumed father.

Section 7612 does "not envision an automatic preference for biological fathers, even if the biological father has come forward to assert his rights." (*Jesusa V., supra,* 32 Cal.4th at p. 604, italics omitted [interpreting § 7612, subd. (a) ]; *Neil S. v. Mary L., supra,* 199 Cal.App.4th at p. 248 [applying § 7612, subd. (b)].) Nor does it envision an automatic preference for fathers who are married to the child's mother. (*Craig L. v. Sandy S.* (2004) 125 Cal.App.4th 36, 51.) "Rather, the core considerations are the integrity of the family and protection of the child's well-being, which require us to assess the *existence and nature* of the social relationship between a putative father and child." (*Neil S. v. Mary L.*, at p. 248, italics added.)

David clearly had a *longer* social relationship with Danny than Kelly had, but the evidence regarding the *nature* of David's relationship with Danny was mixed at best. David testified that he actively and lovingly cared for Danny in many ways. The court, however, found that David's testimony to be "somewhat embellished." The social worker also found David to be inauthentic when she interviewed him in November 2012, and she directly observed troubling conduct by David toward Steven: a harsh grabbing response to a request Steven had made. Both Siblings later told the social worker in separate interviews that David could be harsh or mean to them, and Brianna and Mother's mother corroborated those reports. The Siblings also said they tried to protect Danny from David's anger. Moreover, there was evidence of a less paternalistic motive in David's request for presumed father status as to Danny: he reportedly told Mother that if she left him, he would " 'bury [her] kids so far in the foster care system that [she would] never see them." With presumed father status as to Danny, David had greater control over the progress of the dependency case as to all three children. All of this evidence was before the court.

Moreover, the facts of the dependency case undermined David's claim to presumed father status insofar as they suggested he had not and would not provide a supportive parent-child relationship for Danny. Here, David allegedly committed a

particularly brutal assault on Mother in 2010, attacked her again in late 2012, made a dramatic suicide attempt in the presence of the children shortly thereafter, and was both seen to and was reported to engage in controlling and harsh behavior with his wife and children. Domestic violence in a household where a child resides is detrimental to the child. (§ 3020, subd. (a); see *Jesusa V., supra,* 32 Cal.4th at p. 610.) David further failed to ensure that the older Siblings attended school regularly, and he had ongoing problems with substance abuse and mental health issues. Although the jurisdictional hearing had not yet taken place, David had admitted most of this conduct, according to the Agency reports.

Although Kelly's relationship with Danny was of much shorter duration, there were no similar reports of child mistreatment in evidence. It is true that Kelly admitted using methamphetamine with Mother while they were caring for the Siblings and attempting to conceive another child. However, Kelly testified that Mother had initiated the drug use, that he had stopped using the drug as soon as he moved out of Mother's home, and that he intended to care for Danny while living away from Mother. The court found Kelly to be sincere in his testimony. As discussed *ante*, the court also reasonably found that Kelly was absent from Danny's early life not because he was avoiding parental responsibilities, but because he was unaware of Danny's existence until shortly before the dependency case was initiated. Since learning about Danny, he had done what he could to play an active role in Danny's life. In sum, David's relationship with Danny was longer but of questionable quality, and Kelly's relationship, while comparatively brief, displayed none of the problems that had necessitated Danny's removal from David's custody.

Kelly's biological paternity also carries weight in the analysis. "The biological connection between father and child is unique and worthy of constitutional protection if the father grasps the opportunity to develop that biological connection into a full and enduring relationship." (*Kelsey S., supra,* 1 Cal.4th at p. 838.) One court has stated that "where the weight of the interests of the competing presumptive fathers are in relatively equal balance, biological paternity might properly be relied upon to determine which

23

presumption carried more weight." (*In re Kiana A., supra,* 93 Cal.App.4th at p. 1120, quoted in and distinguished by *Jesusa V., supra,* 32 Cal.4th at p. 609.) There is no dispute that Kelly is Danny's biological father.

As David repeatedly reminds us on appeal, many courts have held that an existing parent-child relationship outweighs biological paternity in cases where conclusive statutory presumptions were challenged on substantive due process grounds. (See *Michelle W. v. Ronald W.* (1985) 39 Cal.3d 354, 362–363 [conclusive presumption constitutionally applied where husband had raised child and biological father had no existing relationship with child]; *Dawn D., supra,* 17 Cal.4th at p. 942 [former § 7630(a) bar on standing was constitutionally applied where § 7611(a) married father raised child and biological father had no existing relationship; also discussing similar majority view in *Michael H. v. Gerard D.* (1989) 491 U.S. 110]; see also *In re Nicholas H.* (2002) 28 Cal.4th 56, 70 [in dependency appeal where only one man sought presumed father status, holding biological paternity was not determinative]. In this case, however, we have found that there is no conclusive statutory presumption favoring David, and neither David nor Kelly present constitutional arguments.

Some courts have also favored the preservation of existing parent-child relationships over biology when applying section 7612, subdivision (b). (*Steven W. v. Matthew S.* (1995) 33 Cal.App.4th 1108, 1116–1117 [nonbiological father with established relationship with child deemed presumed father over married and biological father without such relationship]; *In re Kiana A., supra,* 93 Cal.App.4th at pp. 1117–1118 [possibly nonbiological father who helped raise child deemed presumed father over married, possibly biological, father who had been incarcerated most of the 13-year-old child's life].) However, this bias carries less weight in cases involving very young children. (*J.R. v. D.P.* (2012) 212 Cal.App.4th 374, 391 [when child was only four months old, existing parent-child relationship was not " 'developed' " such that it weighed against *Kelsey S.* father's paternity claim].) Here, Danny was less than 11 months old when the dependency petition was filed.

A juvenile court is permitted to consider "*every* relevant consideration of policy and logic" in weighing the competing presumptions and what is in the best interests of the child. (*Jesusa V., supra,* 32 Cal.4th at p. 608.)  David only shows that the juvenile court might have been justified in striking the balance of competing factors in his favor. It did not.  On these facts, we cannot conclude that the trial court abused its discretion in declaring Kelly the presumed father.  Under the statutory scheme then in place, the court was required to choose one presumed father over the other, and the court made a reasonable choice.  Because David's challenges to the disposition order and the six-month status review order were based solely on the ground that he should have been recognized as Danny's presumed father, we affirm both orders.

## IV.   DISPOSITION

The disposition order and the six-month status review order are affirmed.


_____
Bruiniers, J.


We concur:


_____
Jones, P. J.


_____
Needham, J.


25